The Levay Court further explained that the theory of injury did "not concern the price of the insurance policy per se ," but was that "consumers were 'duped' into joining AARP and paying membership fees in order to access the AARP-branded polices from UnitedHealth," without being told that AARP made "a commission on each sale" and had this ulterior motive to recommend the policies. See Levay , 2018 WL 3425014, at *5. As such, the Levay Court concluded that the state insurance agency's "rate determination is different from what is at issue here-whether the lender mischaracterized the nature of the charges.... [u]nder this theory of recovery, the adjudication of Plaintiffs' claims would not improperly encroach on ... rate-making authority." Id. at *7 (internal quotation marks, alterations, and citation omitted). The Friedman Court similarly reasoned that "the gravamen of the complaint is not the premium rate per se, but the failure to disclose the allegedly fraudulent nature of the commission charged to borrowers," such that the challenged payments "appear to fall outside of the scope of the ... regulatory approval of rates," and the filed-rate doctrine. 283 F.Supp.3d at 878-79 (internal quotation marks and citation omitted).
Just as in Bloom, Levay and Friedman , the plaintiff's state law claims against AARP and its affiliates regarding AARP's allegedly deceptive conduct and unfair business practices are independent of any approved rates UnitedHealth filed in the District of Columbia, or any other state. Thus, resolution of these claims about whether the plaintiff was deceived by and injured by the defendants' false representations *27 concerning the 4.95% charge, or its incorporation as part of the premiums on file, does not necessitate any determination about the reasonableness of the rate.
Accordingly, the filed-rate doctrine does not bar the plaintiff's claims.
C. Choice of Law
The defendants contend that because the plaintiff originally purchased a Medigap policy in 2012 when she resided in Louisiana, and later renewed that coverage while residing in Florida, either Louisiana or Florida law should apply. Defs.' Mem. at 17 n.3, 28. The plaintiff seeks application of District of Columbia law. Pl.'s Opp'n at 22-28. The Court agrees that District of Columbia law applies, though without agreeing with all of the plaintiff's reasoning.
The plaintiff first submits that her claims must be considered under District of Columbia law due to a provision in the group policy indicating as much. See Compl. ¶ 22 (quoting the Certificate of Insurance as stating that AARP "issued the Group Policy in the District of Columbia.... [and] [i]t provides insurance for AARP members and is governed by the laws of the District of Columbia"); Pl.'s Opp'n at 22-24. The defendants argue persuasively, however, that this provision only governs contractual claims related to the insurance policy and does not apply to the tort claims alleged here. See Defs.' Mem. at 32 n.9; Defs.' Reply at 23. The Court agrees that the contractual choice-of-law provision does not necessarily bind parties with respect to non-contractual causes of action, such as those asserted here. See Base One Techs., Inc. v. Ali , 78 F.Supp.3d 186, 192 (D.D.C. 2015) (noting that contractual choice-of-law provisions do not bind parties with respect to tort actions) (citing Minebea Co., Ltd. v. Papst , 377 F.Supp.2d 34, 38-39 (D.D.C. 2005) ). Nevertheless, under a choice-of-law analysis, the plaintiff prevails on the issue of which state's law governs this action.
When exercising diversity jurisdiction, the choice-of-law rules of the forum apply. Klaxon Co. v. Stentor Elec. Mfg. Co. , 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) ; Shaw v. Marriott Int'l, Inc. , 605 F.3d 1039, 1045 (D.C. Cir. 2010). Under District of Columbia law, the first step in a choice-of-law analysis is determining "whether a 'true conflict' exists between the laws of the [competing] jurisdictions-'that is, whether more than one jurisdiction has a potential interest in having its law applied and, if so, whether the law of the competing jurisdictions is different.' " In re APA Assessment Fee Litig. , 766 F.3d 39, 51-52 (D.C. Cir. 2014) (citing GEICO v. Fetisoff , 958 F.2d 1137, 1141 (D.C. Cir. 1992) ; Fowler v. A & A Co. , 262 A.2d 344, 348 (D.C. 1970) ). If there is no conflict, the law of the District of Columbia applies by default. See Estate of Doe v. Islamic Republic of Iran , 808 F.Supp.2d 1, 20-21 (D.D.C. 2011). If a conflict does exist, courts must employ a "modified governmental interests analysis which seeks to identify the jurisdiction with the most significant relationship to the dispute." Washkoviak v. Student Loan Mktg. Ass'n , 900 A.2d 168, 180 (D.C. 2006) (internal quotation marks and citation omitted); see also Oveissi v. Islamic Republic of Iran , 573 F.3d 835, 842 (D.C. Cir. 2009) ("District of Columbia courts blend a 'governmental interests analysis' with a 'most significant relationship' test." (internal quotation marks and citation omitted) ). The Court addresses each of these issues seriatim.
1. Florida and Louisiana Law Conflicts With District of Columbia Law
"A conflict of laws does not exist when the laws of the different jurisdictions *28 are identical or would produce the identical result on the facts presented." USA Waste of Md., Inc. v. Love , 954 A.2d 1027, 1032 (D.C. 2008) (footnote omitted). On the other hand, a conflict may be found when two jurisdictions have different applicable laws, which would result in different outcomes. See id. In this case, the defendants argue vigorously that if the plaintiff were to litigate her claims under Florida law or Louisiana law, the outcome of this case would be different because her claims would be barred by the filed-rate doctrine. Defs.' Reply at 10-11 (citing Patel , 904 F.3d at 1320, 1326 (Florida law) ); Defs.' Mem. at 27 n.8 (citing Medco Energi, U.S., L.L.C. v. Sea Robin Pipeline Co. , 895 F.Supp.2d 794, 816 (W.D. La. 2012) ), aff'd , 729 F.3d 394 ( (Louisiana law) ). The plaintiff appears to concede a conflict with Louisiana law, while suggesting her claim is distinguishable from Florida-law claims barred by the filed-rate doctrine because UnitedHealth is not a defendant in the action. See Pl.'s Opp'n at 18 & n.5.[10] No matter. Even assuming a demonstrated conflict among the laws of these three jurisdictions, consideration of the "governmental interest" and "significant relationship" tests confirms that the plaintiff's claims are governed by District of Columbia law.
2. Governmental Interest Test Favors Application of District of Columbia Law
The governmental interest analysis requires a court to "evaluate the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be most advanced by having its law applied to the facts of the case under review." Oveissi , 573 F.3d at 842 (internal quotation marks and citation omitted). The defendants point out that Florida and Louisiana have comprehensive regulatory schemes for Medigap insurance and therefore have a strong governmental interest in having their laws applied. See Defs.' Mem. at 30-32. Moreover, they contend that Florida and Louisiana's interests outweigh the interests of the District of Columbia because the defendants' "place of business bears no meaningful connection to claims regarding a Louisiana and Florida resident who purchased Louisiana- and Florida-regulated insurance." Id. at 31-32.
The plaintiff counters that the most heavily weighted factor is the place of the conduct causing injury, which "favors the District of Columbia because that is where AARP devised its scheme, prepared and approved of the marketing materials, entered into the Agreement with UnitedHealth, and where AARP Trust skimmed off 4.95% of Plaintiff's Medigap payments and forwarded it to AARP and ASI." Pl.'s Opp'n at 25-26. The plaintiffs' argument, based on the nature of the claims here, is more persuasive.
The plaintiff is seeking to vindicate her own rights, and the rights of those similarly situated under the District of Columbia's CPPA. For CPPA claims, "[t]he District of Columbia has an interest in protecting its own citizens from being victimized by unfair trade practices and an interest in regulating the conduct of its business entities. " Shaw , 605 F.3d at 1045 (emphasis added). Indeed, the CPPA is not limited in its application to consumers or companies who are residents of the District, so the plaintiff's residence in Florida or previous residence in Louisiana does not prevent her from stating a claim under the CPPA. See *29 D.C. CODE § 28-3904 (it is a violation of the CPPA for any "person" to engage in deceptive trade practices); see also Washkoviak , 900 A.2d at 180-83 (allowing non-residents to bring claims under the CPPA and claims under District of Columbia common law). Even if Florida or Louisiana have an equal interest as the District of Columbia in applying their own laws, in such a situation the law of the forum state should apply. See Washkoviak , 900 A.2d at 182 (citing Logan v. Providence Hosp. Inc. , 778 A.2d 275, 278 (D.C. 2001) ). Thus, the District of Columbia has a strong governmental interest in the application of the CPPA in this case.
3. The Significant Relationship Test Favors Application of D.C. Law
When evaluating which jurisdiction has the "most significant relationship" to the case, courts in the District of Columbia "must consider the factors enumerated in the RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145, which are: (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties; and (4) the place where the relationship, if any, between the parties is centered." Oveissi , 573 F.3d at 842 (internal quotation marks, alterations, and citations omitted); Washkoviak , 900 A.2d at 180.[11] The weighing of these four factors demonstrates that the District of Columbia has a more significant relationship to the plaintiff's misrepresentation and deceptive advertising claims, as well as the common law claims based on the same set of facts.
a. The Place of Injury
The first factor requires the Court to consider the place where the injury to *30 the plaintiff occurred. In a typical misrepresentation case, the injury occurs where the plaintiff "received the alleged misrepresentations and made their payments." Washkoviak , 900 A.2d at 181. In this case, the plaintiff alleges that the defendants violated the CPPA by falsely advertising and misrepresenting the source and purpose of the 4.95% charge. The parties agree that the place of the plaintiff's injury for her misrepresentation claims are Florida or Louisiana, where she "received the alleged misrepresentations," Washkoviak , 900 A.2d at 181. See Pl.'s Opp'n at 25; Defs.' Mem. at 30-31.
Yet, according to the Restatement and the D.C. Court of Appeals, "the place of injury is less significant in the case of fraudulent misrepresentations" than "in the case of personal injuries and of injuries to tangible things." Washkoviak , 900 A.2d at 181-82 (internal quotation marks and citation omitted) (stating that there was a "discounted value of the place of injury in cases ... involving claims of misrepresentation"); see also RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 cmt. f ("[T]he place of injury is less significant in the case of fraudulent misrepresentations and of such unfair competition as consists of false advertising and the misappropriation of trade values.") (internal citation omitted). Accordingly, although this factor weighs in favor of applying Florida or Louisiana law, the significance of this result is diminished because of the nature of the claims.
b. The Place Where the Conduct Causing the Injury Occurred
The second factor in the choice-of-law analysis requires assessment of where the conduct causing the injury occurred. According to the Restatement, as previously discussed, "the place of injury does not play so important a role for choice-of-law purposes in the case of false advertising.... Instead, the principal location of the defendant's conduct is the contact that will usually be given the greatest weight." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 cmt. f. See also Margolis , 818 F.Supp.2d at 102-03 (quoting Washkoviak , 900 A.2d at 181-82 for the proposition that the place of injury has a "discounted value" in cases involving claims of misrepresentation).
Likewise, in cases alleging a misrepresentation, the place where the conduct causing the injury occurred is the place where the defendant has its principal place of business and sets its policies and practices. See Wu v. Stomber , 750 F.3d 944, 949 (D.C. Cir. 2014) (Kavanaugh, J.) (holding that the "conduct causing the injury" occurred in the location of the defendant's principal place of business); RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 cmt. e (where the conduct occurred will usually be given particular weight when the place of injury "can be said to be fortuitous or when for other reasons it bears little relation to the occurrence and the parties with respect to the particular issue.... such as in the case of fraud and misrepresentation"). The defendants do not dispute that they set their practices and policies in the District of Columbia, where AARP is headquartered and where each of the AARP affiliates has its primary place of business. As a result, this second factor favors the application of District of Columbia law.
c. The Residence, Place of Incorporation, and Place of Business of the Parties
The third factor of the choice-of-law analysis focuses on the residency of the parties in the case. At the time she purchased AARP's Medigap policies, the plaintiff was a resident either of Louisiana or of Florida. See Pl.'s Opp'n at 25. The *31 defendants AARP, AARP Trust, and ASI are all incorporated, headquartered, and maintain their primary place of business in the District of Columbia. Id. at 26 (citing Compl. ¶¶ 21-23). As already noted, the District of Columbia has an interest in regulating the conduct of businesses incorporated there. See Shaw , 605 F.3d at 1045. Although the states of Florida and Louisiana may have an interest in regulating insurance companies within their states, AARP is not such an insurance company. Moreover, to the extent those other states have an interest in regulating third-parties involved in the sale of insurance policies within their states, those interests are less than that third-party's place of incorporation and place of business. In any event, where interests may be equal, the forum state's law applies. See Washkoviak , 900 A.2d at 182. Consideration of this factor thus favors application of District of Columbia law.
d. Where the Relationship Between the Parties is Centered
The fourth Restatement factor instructs the Court to determine where the relationship between the parties is centered. The defendants suggest that because Medigap policies are subject to state regulation, the plaintiff's relationship to the defendants was centered in Louisiana, where she originally purchased her Medigap policy, and Florida, where she renewed it. See Defs.' Mem. at 31. The plaintiff counters that the fourth factor "clearly favors the District of Columbia above any other jurisdiction [because] (1) the AARP membership organization is located in the District of Columbia and AARP membership is a requirement for purchasing Medigap insurance policies; (2) AARP's decision to market AARP Medigap Policies to AARP members emanated from the District of Columbia; and (3) it is where AARP Trust segregates Plaintiff's money, forwarding her premiums to UnitedHealth and diverting 4.95% to AARP and ASI." Pl.'s Opp'n at 26 (citing Compl. ¶¶ 22, 23, 71).
In this action, where the gravamen of the plaintiff's complaint is misrepresentation and false advertising, the Court agrees that the plaintiff's relationship with the defendants is centered in the District of Columbia, where the defendants have their primary place of business and where they make their policies and practices regarding advertising.
4. District of Columbia Law Is Applied
Having considered both the governmental interest analysis and the significant relationship test, informed by the four factors outlined by Section 145 of the Second Restatement, the Court concludes that District of Columbia law should govern this dispute. The place of the plaintiff's alleged injury due to the defendants' alleged misrepresentations and failure to disclose certain information occurred in Louisiana or Florida, but the alleged misconduct emanated from District of Columbia, where the defendants are headquartered and have their primary place of business. As the plaintiff alleges, "AARP formulated and conceived its role in the scheme largely in the District of Columbia, directed the scheme complained of ... from the District of Columbia, and its communications and other efforts to execute the scheme largely emanated from the District of Columbia.... [including] AARP's decision to market AARP Medigap policies to AARP members, its policies and practices relating to AARP Medigap Policies, including the ... decision to collect the 4.95% commission." Compl. ¶¶ 70-71. In light of the fact that this case involves allegations of misrepresentation, for which the place of the alleged injury is *32 less important than in other tort cases, see In re APA Assessment Fee Litig. , 766 F.3d at 54 (citing Washkoviak , 900 A.2d at 182 ), bolstered by the District of Columbia's interest in regulating companies incorporated under its laws, District of Columbia law will be applied to the instant claims.
D. Statutes of Limitations
The defendants raise yet another threshold issue: namely, that the plaintiff filed the instant Complaint outside of the statute of limitations under both Louisiana and District of Columbia law, since she first purchased her Medigap policy in 2012. See Defs.' Mem. at 37-38. The plaintiff counters that she last renewed her policy in November 2016, within the District of Columbia's three-year statute of limitations for the filing of her Complaint in 2018, and in any event her claim should be allowed under either a "continuing tort" or "fraudulent concealment" theory. See Pl.'s Opp'n at 32-34 & n.17. For the following reasons, the Court declines, at this stage, to dismiss the Complaint as untimely.
A defendant may raise a statute of limitations defense "in a pre-answer motion under ... Rule[ ] 12(b)." Smith-Haynie v. District of Columbia , 155 F.3d 575, 577 (D.C. Cir. 1998). The D.C. Circuit has "repeatedly held," however, that "courts should hesitate to dismiss a complaint on statute of limitations grounds based solely on the fact of the complaint." Firestone v. Firestone , 76 F.3d 1205, 1209 (D.C. Cir. 1996) (per curiam). "[S]tatute of limitations issues often depend on contested questions of fact, [so] dismissal is appropriate only if the complaint on its face is conclusively time-barred." Bregman v. Perles , 747 F.3d 873, 875 (D.C. Cir. 2014) (internal quotation marks omitted) (quoting de Csepel v. Republic of Hungary , 714 F.3d 591, 603 (D.C. Cir. 2013) ).
Under District of Columbia law, the plaintiff must bring her CPPA and related common law claims within three years from the time when her right to maintain the action accrued. See D.C. CODE § 12-301(8) ; Comer v. Wells Fargo Bank, N.A. , 108 A.3d 364, 369 n.7 (D.C. 2015). A claim accrues when the plaintiff has "either 'actual notice of her cause of action' or is deemed to be on 'inquiry notice' by failing to 'act reasonably under the circumstances in investigating matters affecting her affairs, where 'such an investigation, if conducted, would have led to actual notice.' " Medhin v. Hailu , 26 A.3d 307, 310 (D.C. 2011) (quoting Harris v. Ladner , 828 A.2d 203, 205-06 (D.C. 2003) ). "[W]hat constitutes the accrual of a cause of action is a question of law; the actual date of accrual, however, is a question of fact." Medhin , 26 A.3d at 310 (internal alteration, quotation marks, and citation omitted). Moreover "[w]hat is 'reasonable under the circumstances' is a highly factual analysis. The relevant circumstances include, but are not limited to, the conduct and misrepresentations of the defendant, and the reasonableness of the plaintiff's reliance on the defendant's conduct and misrepresentations." Diamond v. Davis , 680 A.2d 364, 372 (D.C. 1996).
Related to the assessment of the reasonableness of reliance, the District of Columbia recognizes a "discovery rule" that operates to trigger the accrual date for the limitations period upon discovery of the injury when the alleged tortious conduct obscures when the injury occurred. See Hughes v. Abell , 794 F.Supp.2d 1, 12 (D.D.C. 2010). Under this rule, a cause of action accrues "when one knows or by the exercise of reasonable diligence should know (1) of the injury, (2) its cause in fact, and (3) of some evidence of wrongdoing."
*33 Id. (internal quotation marks omitted) (quoting Morton v. Nat'l Med. Enters., Inc. , 725 A.2d 462, 468 (D.C. 1999) ). "[W]hen one person defrauds another, there will be a delay between the time the fraud is perpetrated and the time the victim awakens to that fact." In re Estate of Delaney , 819 A.2d 968, 981 (D.C. 2003) (internal quotation marks and citation omitted).
Relatedly, the District of Columbia also recognizes a "continuing tort doctrine," which allows a plaintiff to recover for harms that would otherwise be time barred when she suffers "(1) a continuous and repetitious wrong, (2) with damages flowing from the act as a whole rather than from each individual act, and (3) at least one injurious act ... within the limitation period." Beard v. Edmondson & Gallagher , 790 A.2d 541, 547-48 (D.C. 2002) (internal quotation marks and citation omitted). This doctrine may apply when the claimed "injury might not have come about but for the entire course of conduct." Pleznac v. Equity Residential Mgmt., L.L.C. , 320 F.Supp.3d 99, 104 (D.D.C. 2018) (internal quotation marks and emphasis omitted) (quoting John McShain, Inc. v. L'Enfant Plaza Props., Inc. , 402 A.2d 1222, 1231 n.20 (D.C. 1979) ).
As to this latter theory, the defendants argue that the continuing tort doctrine is inapplicable to a situation where the plaintiff makes a series of periodic payments, all stemming from an initial wrong outside of the limitations period, relying heavily on Pleznac , a case that is not binding on this Court. Defs.' Reply at 15-16 (citing Pleznac ). The plaintiff in Pleznac alleged that she was fraudulently induced into signing a lease and that the renewal of that lease, occurring within the statute of limitations period, allowed her to bring a claim for the initial fraud. Pleznac , 320 F.Supp.3d at 105-06. The Court rejected that argument, but held open the possibility that a plaintiff in a similar situation could "seek[ ] relief based on ... subsequent lease renewals.... [because] [i]t could theoretically be the case that the renewals were independent acts of deception rather than mere injuries flowing from the initial misrepresentations or omissions." Id. at 105. The possibility that the Court held open in Pleznac applies here where the plaintiff alleges that AARP misrepresented the nature of the 4.95% charge both when she originally bought her policy and when she renewed it, and that therefore each renewal was an "independent act[ ] of deception" subject to the continuing tort doctrine. Id.
In any event, assuming that the plaintiff's claim did not accrue until she learned the specifics of the 4.95% charge constituting a "royalty" UnitedHealth owed AARP and that consumers were charged the royalty in conjunction with their premium payments, she does not specify in her Complaint when she learned those details. Nor does any party address whether the plaintiff should be deemed to have been on inquiry notice of her claim as a result of the filing, as early as 2009, of other lawsuits against AARP with similar allegations, as well as AARP's testimony in 2011 before the House Ways and Means Committee, which testimony and related Congressional investigations are cited in the Complaint, see Compl. ¶¶ 48, 59-61. Moreover, the Complaint does not specify when the plaintiff viewed the defendants' advertisements or statements regarding the 4.95% charge, or when the plaintiff learned facts leading her to believe that such advertisements or statements were materially false. These dates may be relevant to an analysis of whether the plaintiff's claims are time barred or whether the discovery rule should apply. Yet, given that these factual matters remain unknown, and since the Complaint is not "on its face" conclusively *34 time barred, Bregman , 747 F.3d at 875, dismissal for statute of limitations reasons is not appropriate at this time.
E. The Plaintiff Plausibly States a Claim for Relief
The plaintiff asserts four claims against all three defendants: unfair trade practices under the CPPA, conversion, unjust enrichment, and fraudulent concealment. Since the factual allegations sufficiently state plausible claims, as explained further below, the defendants' motion to dismiss for failure to state a claim is denied.
1. Count One States a Violation of the CPPA
The CPPA is a "comprehensive statute designed to provide procedures and remedies for a broad spectrum of practices which injure consumers." Atwater , 566 A.2d at 465. This law is expressly intended to "be construed and applied liberally to promote its purpose." D.C. CODE § 28-3901(c). The plaintiff invokes the CPPA to challenge the defendants' conduct in marketing, soliciting members to enroll in, and administering Medigap policies. Specifically, the plaintiff alleges that AARP committed an unlawful trade practice, in violation of the CPPA, by issuing solicitation materials, letters to prospective consumers, billing statements, renewal letters, and website statements containing misrepresentations of material facts concerning the 4.95% payment and AARP's collection and receipt, without being a licensed insurance broker or agent, of a commission on each policy sale or renewal. Compl. ¶¶ 5, 92-96. The plaintiff claims financial harm by these unlawful trade practices because she would have sought a different Medigap policy that did not incorporate a 4.95% "commission that AARP is not legally entitled to," id. ¶ 97, and because the defendants' actions "deprived [her] of truthful information regarding [her] choice" of Medigap policies, id. ¶ 100.
The defendants challenge the validity of this CPPA claim on four grounds: (1) the CPPA does not apply to transactions conducted outside the District of Columbia, Defs.' Mem. at 38-39; (2) the plaintiff lacks standing because she does not allege an injury in fact, id. at 39-41; (3) the defendants do not qualify as a "merchant" under the CPPA, id. at 41; and (4) unfair trade practices through material misrepresentations have not been sufficiently pled, id. at 42-44 Each of these arguments falls short.
a. The CPPA Applies to the Alleged Transactions
The CPPA applies to the transactions alleged in this case. The defendants argue that the CPPA only "establishes an enforceable right to truthful information from merchants about consumer goods and services that are or would be purchased, leased, or received in the District of Columbia," and, since the plaintiff never alleges that she purchased, leased, or even saw any advertisements in the District of Columbia, the CPPA claim should be dismissed. Defs.' Mem. at 39 (emphasis omitted) (citing D.C. CODE § 28-3901(c) ). Noting that the CPPA must "be construed and applied liberally to promote its purpose," Pl.'s Opp'n at 35 (internal quotation marks omitted) (quoting D.C. CODE § 28-3901(c) ), the plaintiff contends that, regardless of her connections to other states, the CPPA applies when "the plaintiff ... avers that the defendant[s'] actions in the District of Columbia gave rise to the plaintiff's claims under the CPPA," which the plaintiff has done here, Pl.'s Opp'n at 35 (emphasis omitted) (quoting Renchard v. Prince William Marine Sales, Inc. , 87 F.Supp.3d 271, 283 (D.D.C. 2015) ). The Complaint expressly alleges that "AARP formulated and conceived its role in the scheme largely in the District of Columbia, directed the *35 scheme ... from the District of Columbia, and its communications and other efforts to execute the scheme largely emanated from the District of Columbia.... [including] the oversight of the marketing ... and decision to collect the 4.95% commission" Compl. ¶¶ 70, 71. These allegations sufficiently "aver[ ] that the defendants' actions in the District of Columbia gave rise to [her] claims under the CPPA." Renchard , 87 F.Supp.3d at 283 (emphasis omitted).
The defendants question the plaintiff's reliance on Renchard, see Defs.' Reply at 17, a case in which a yacht owner asserted a CPPA claim against the Virginia company that financed his yacht purchase and subsequently seized the yacht in the District of Columbia for failure to make payment for improvements made to the yacht in the District of Columbia. See Renchard , 87 F.Supp.3d at 274-76. The Court found no merit to defendants' claims that the CPPA would involve extraterritorial conduct because in Renchard , the District of Columbia was "where the injury occurred and the place where the conduct causing the injury occurred." Id. at 283. The defendants attempt to distinguish Renchard by pointing out that the Court also noted that the yacht was received in the District of Columbia, whereas in this suit the plaintiff purchased and received insurance in Florida and Louisiana. Defs.' Reply at 17. Yet this overlooks the Court's strong reliance on the plaintiff's allegations that "the defendants' actions in the District of Columbia gave rise to the plaintiff's claims under the CPPA," Renchard , 87 F.Supp.3d at 283 (emphasis in original), and that even if other states may have interests in the matter, "the injury complained of, and direct conduct contributing to that injury, occurred in Washington D.C.," id. The same is true here: the plaintiff alleges that the defendants' false advertising and unfair business practices emanated from the District of Columbia, where they are based, and, as noted supra in Section III.C.3, the place of the plaintiff's injury is less important in false representation cases than where the conduct causing the injury occurred.
Furthermore, this Court has previously held that the CPPA had "extraterritorial" application and could govern disputes between out-of-state plaintiffs and a defendant headquartered in the District of Columbia. See Shaw v. Marriott Int'l, Inc. , 474 F.Supp.2d 141, 147 & n.4, 149 (D.D.C. 2007). Indeed, Shaw noted that "courts in the District of Columbia have already concluded that its policies are advanced by application of the CPPA to cases involving non-District of Columbia consumers, merchants, and transactions." Id. at 149-50 (citing Williams v. First Gov't Mortg. & Inv'rs Corp. , 176 F.3d 497, 499 (D.C. Cir. 1999) ); Washkoviak , 900 A.2d at 177, 180-81 ) ); see also In re APA Assessment Fee Litig. , 766 F.3d at 53-55 (upholding the District Court's choice-of-law analysis applying District of Columbia law when out-of-state plaintiffs sued a defendant headquartered in the District of Columbia for misrepresentations regarding membership fees).
In light of this precedent, the Court concludes that the CPPA applies to the conduct alleged in this case.
b. The Plaintiff Has Standing to Bring a CPPA Claim
Contrary to the defendants' contentions, the plaintiff has standing to pursue this CPPA claim. The "irreducible constitutional minimum" of standing consists of three elements. Lujan v. Defs. Of Wildlife , 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The plaintiff must have suffered (1) an injury in fact (2) that is fairly traceable to the challenged conduct of the defendant and (3) that is likely *36 to be redressed by a favorable judicial decision. City of Boston Delegation v. FERC , 897 F.3d 241, 248 (D.C. Cir. 2018). The injury in fact must be both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." Lujan , 504 U.S. at 560, 112 S.Ct. 2130 (internal quotation marks and citations omitted).
The defendants contend that the plaintiff suffered no injury in fact because she paid precisely the premium that was approved by state regulatory agencies, Defs.' Mem. at 40, and even if she believes she should have received more information about the royalties deducted from that premium, she "has not alleged, and cannot plausibly allege, any loss caused by United[Health]'s allocation of premium revenue to program expenses, including the AARP royalty," id. According to the defendants, the plaintiff cannot avoid this flaw in her alleged injury in fact by positing that had she known about the defendants' alleged misconduct, she would have purchased Medigap insurance from another company. See id. (citing Compl. ¶ 79). The defendants further contend that the plaintiff "alleges no facts making this bald assertion plausible," including, for example, "what alternative carrier Plaintiff would have considered, the rates offered by that hypothetical alternative provider, or whether those rates were lower." Defs.' Mem. at 40. Consequently, this "conclusory statement that she would have purchased different coverage does not," in the defendants' view, "permit an inference that she suffered any loss." Id. at 40-41.
Drawing all inferences in the plaintiff's favor, as is required at this procedural stage, she has sufficiently alleged financial harm. See Attias v. CareFirst, Inc. , 865 F.3d 620, 622, 627-28 (D.C. Cir. 2017) (recognizing that allegations, rather than evidence of injury, may support standing at the motion-to-dismiss stage). This is especially true in the context of Medigap policies, which are often identical in every respect except for price. See CMS Medigap Guide at 9, 13, 19 ("Different insurance companies may charge different premiums for the same exact policy."). The plaintiff asserts that she has sufficiently alleged an injury in fact based on: (1) the financial harm she suffered when AARP misled her into paying an illegal 4.95% commission; and (2) the violation of her statutory right to truthful information. Pl.'s Opp'n at 37. The plaintiff has sufficiently alleged that, had she understood what was presented to her as a "premium" to "pay expenses incurred by the [AARP] Trust in connection with the insurance programs and to pay the insurance company for ... insurance coverage," Compl. ¶ 64, also included a 4.95% charge intended to meet UnitedHealth's royalty obligations, she would have sought out a different, lower-priced policy, and therefore she was financially harmed by the allegedly misleading advertisements. These allegations suffice to establish an injury in fact at this stage.
In making this determination, resolving whether the 4.95% charge is properly characterized as a "commission" or a "royalty" or an unlawful "kickback" is unnecessary. Regardless of labels, all the plaintiff is required to do is sufficiently to allege economic harm, "a classic form of injury-in-fact." Osborn v. Visa Inc. , 797 F.3d 1057, 1064 (D.C. Cir. 2015) (internal quotation marks and citation omitted); see also Carpenters Indus. Council v. Zinke , 854 F.3d 1, 5 (D.C. Cir. 2017) (Kavanaugh, J.) ("A dollar of economic harm is still an injury-in-fact for standing purposes."). She has sufficiently stated an injury in fact, as other courts have found with respect to virtually identical allegations regarding the same 4.95% charge. See Levay , 2018 WL 3425014, at *4-5 ; Friedman , 283 F.Supp.3d at 879-80 (holding that the *37 plaintiff had established an injury, but dismissing the claim because the plaintiff no longer held a Medigap policy and therefore had no standing to pursue injunctive relief).[12]
The plaintiff has sufficiently alleged financial harm as a result of the defendants' actions, and thus has met the injury in fact requirement to seek damages in Count One alleging a violation of the CPPA.[13]
c. The Defendants Qualify as Merchants Under the CPPA
The defendants argue that the CPPA only applies to "merchants" who supply "goods and services," whereas none of the defendants sold, supplied, or transferred insurance policies to the plaintiff in a consumer-merchant relationship. Defs.' Mem. at 41-42. "[T]he CPPA does not cover all consumer transactions, and instead only covers 'trade practices arising out of consumer-merchant relationships.' " Sundberg v. TTR Realty, LLC , 109 A.3d 1123, 1129 (D.C. 2015) (quoting Snowder v. District of Columbia , 949 A.2d 590, 599 (D.C. 2008) ). The CPPA defines "merchant" as one "who in the ordinary course of business does or would sell, lease (to), or transfer, either directly or indirectly, consumer goods or services ... or would supply the goods or services which are or would be the subject matter of a trade practice." D.C. CODE § 28-3901(a)(3). Persons or entities sufficiently "connected with the supply side of the consumer transaction" meet the CPPA's definition of a merchant. Adler v. Vision Lab Telecomms., Inc. , 393 F.Supp.2d 35, 39 (D.D.C. 2005) (internal quotation marks omitted) (quoting Save Immaculata/Dunblane, Inc. v. Immaculata Preparatory Sch. , 514 A.2d 1152, 1159 (D.C. 1986) ).
The plaintiff alleges that "AARP's solicitation, marketing, and sale of AARP Medigap Policies constitutes the sale of consumer goods or services in the ordinary course of business." Compl. ¶ 53. In support, the plaintiff points out that, under the Agreement with UnitedHealth, AARP: (1) markets, solicits, sells, and renews AARP Medigap policies, id. ¶ 38; (2) collects and remits premium payments on behalf of *38 UnitedHealth, id. ; (3) owns all solicitation materials related to the AARP Medigap program, id. ¶ 47; (4) performs quality control and generally oversees UnitedHealth operations relating to the Medigap program, id. ¶ 48; (5) has authority over UnitedHealth's operations regarding the Medigap program, id. ; (6) gives prior review and approval over all communication regarding the Medigap program, id. ; (7) has the authority to consult, review, and consent to premium levels and rates and sales and distribution plans, id. ; and (8) has review and modification authority over UnitedHealth's Medigap-related contracts with certain third-party vendors, id. The plaintiff posits that the 4.95% royalty charge is how UnitedHealth "compensates AARP to act as its agent in connection with the marketing, solicitation, sale, and administration of AARP Medigap policies." Id. ¶ 49; see also id. ¶¶ 50-52 (describing this "agency" relationship); id. ¶ 73 (suggesting that these activities render AARP an unlicensed insurance agent or broker). In other words, according to the plaintiff, "the [defendants'] involvement in the allegedly fraudulent [scheme] in this case is ... far greater than a mere recommendation for services." McMullen v. Synchrony Bank , 164 F.Supp.3d 77, 92 (D.D.C. 2016).
Notwithstanding all of the defendants' alleged activities to connect consumers to Medigap policies, the defendants argue that they are not "merchants" within the meaning of the CPPA because the plaintiff has not alleged that they "sold, supplied, or transferred insurance policies" in a manner creating a consumer-merchant relationship. Defs.' Mem. at 41. To the extent the plaintiff does allege such activities, see, e.g. , Compl. ¶¶ 38-52, the defendants dismiss these allegations as "bare legal conclusions regarding AARP's actions" under its Agreement for licensing intellectual property. Defs.' Mem. at 42. To the contrary, the plaintiff has alleged far more than "bare legal conclusions" and has, in fact, provided ample detail concerning AARP's extensive responsibilities with respect to marketing, advertising, soliciting, and administering Medigap policies to allow the reasonable inference that the defendants are so "connected with the supply side of the consumer transaction" so as to constitute merchants under the CPPA. See Adler , 393 F.Supp.2d at 39 (internal quotation marks omitted).
Moreover, the defendants' reliance on Adler to distinguish their activities is based on an apparent misinterpretation of its holding. The defendants cite Adler for the proposition that a "defendant that sent unsolicited advertisements on behalf of third party was not a 'merchant' within the meaning of the CPPA because the plaintiffs did not purchase or receive services from defendant." Defs.' Mem. at 42. The defendants' case summary ignores Adler' s holding that the defendants were merchants, but no consumer-merchant relationship existed because the plaintiffs never bought anything , and thus were not consumers. 393 F.Supp.2d at 40. Adler explicitly held that parties who do more than merely recommend goods and services may qualify as merchants under the CPPA, id. at 39-40, consistent with the holdings in other cases from this Court addressing this issue. See, e.g., Hall v. S. River Restoration, Inc. , 270 F.Supp.3d 117, 123 (D.D.C. 2017) (CKK); McMullen , 164 F.Supp.3d at 91-92 (JEB) ; Ihebereme v. Capital One, N.A. , 730 F.Supp.2d 40, 52 (D.D.C. 2010) (ESH). Based on the plaintiff's allegations of the defendants' extensive involvement in marketing, selling, and administering Medigap policies to consumers, the defendants do far more than endorse UnitedHealth's Medigap policies.
For the foregoing reasons, the plaintiff has sufficiently alleged facts plausibly *39 showing that the defendants meet the CPPA's definition of "merchant."
d. The Plaintiff Sufficiently Alleged Material Misrepresentations
Finally, the plaintiff has sufficiently and plausibly alleged that the defendants engaged in unfair trade practices under the CPPA by materially misrepresenting information about the 4.95% charge.
The CPPA forbids a variety of "unfair or deceptive trade practice[s], whether or not any consumer is in fact misled, deceived, or damaged thereby," D.C. CODE § 28-3904, and "establishes an enforceable right to truthful information from merchants about consumer goods and services that are or would be purchased, leased, or received in the District of Columbia." Mann , 251 F.Supp.3d at 116-17 (citing D.C. CODE §§ 28-3901 to 28-3903 ; id. § 28-3901(c) ) (establishing enforceable right to truthful information). A "trade practice" is "any act which does or would create, alter, repair, furnish, make available, provide information about, or, directly or indirectly, solicit or offer for or effectuate, a sale, lease or transfer, of consumer goods and services." D.C. CODE § 28-3901(a)(6).
The plaintiff asserts violations of three CPPA "unfair or deceptive trade practice" provisions, claiming the defendants (1) misrepresented a material fact which has a tendency to mislead, in violation of id. § 28-3904(e) ; (2) failed to state a material fact if such failure tends to mislead, in violation of id. § 28-3904(f) ; and (3) used innuendo or ambiguity as to a material fact, which has a tendency to mislead, in violation of id. § 28-3904(f-1). Compl. ¶ 93. As to each CPPA provision, the plaintiff points to three basic categories of misrepresentations: (1) the defendants' statements or omissions regarding the 4.95% charge, including its amount, what it is used for, and who pays it, see Compl. ¶ 96; (2) the defendants' activities as a de facto or unlicensed insurance agent of UnitedHealth, rendering their activities on behalf of UnitedHealth to be unfair trade practices, id. ; and (3) the defendants' misrepresentation of the 4.95% charge a "royalty" when it qualifies as a commission and may not lawfully be collected by AARP under District of Columbia law, id.
In assessing whether the plaintiff's allegations plausibly plead an unfair or deceptive trade practice through use of material misrepresentations, a court must "consider an alleged unfair trade practice 'in terms of how the practice would be viewed and understood by a reasonable consumer.' " Saucier v. Countrywide Home Loans , 64 A.3d 428, 442 (D.C. 2013) (quoting Pearson v. Chung , 961 A.2d 1067, 1075 (D.C. 2008) ). The same "reasonable consumer" standard applies to the question of whether information has a tendency to mislead. See Saucier , 64 A.3d at 442. "How the practice would be viewed by a reasonable consumer is generally a question for the jury," Mann , 251 F.Supp.3d at 126, although "there are times when it is sufficiently clear to be determined as a matter of law," id. (citing Alicke , 111 F.3d at 912 (determining that no reasonable person could interpret the consumer phone contract at hand in the manner the plaintiff had asserted) ). For claims under D.C. CODE § 28-3904 (e), (f), and (f-1), "a statement or 'omission is material if a significant number of unsophisticated consumers would find that information important in determining a course of action.' " Mann , 251 F.Supp.3d at 126 (internal quotation marks omitted) (quoting Saucier , 64 A.3d at 442 ). "Ordinarily the question of materiality should not be treated as a matter of law." Saucier , 64 A.3d at 442 (internal quotation marks and citation omitted).
With respect to the first category of alleged misrepresentations, concerning *40 the defendants' statements or omissions regarding the nature and purpose of the 4.95% charge, the plaintiff identifies two specific material misrepresentations: (1) AARP's disclaimer indicating that premiums are used to pay expenses incurred by AARP Trust and to pay UnitedHealth for insurance coverage; and (2) AARP's disclosure that UnitedHealth pays royalty fees to AARP for use of its intellectual property. See Compl. ¶ 96. The statements are made on AARP's websites, see Compl. ¶ 51, and "through television commercials ... mailings, and [print] advertisements," id. ¶ 50. Although the plaintiff does not specify when she saw these statements or came to believe they were misleading, the defendants concede that the identified statements appear on AARP products or sponsored advertising, and have even attached exhibits of the advertising materials. See Defs.' Mem. at 17-18 (referring to Ex. 2 and Ex. 3 and quoting language disclosing the existence of the "royalty"). The only question, then, is whether the plaintiff has sufficiently alleged that the statements are materially misleading under the CPPA.
The plaintiff alleges that AARP's Medigap disclaimer misleads consumers by stating that "premiums [collected from consumers] are used to pay expenses incurred by [AARP] Trust in connection with the insurance programs and to pay the insurance company for [consumer's] insurance coverage," Compl. ¶ 64, which, the plaintiff alleges, is "highly misleading and deceptive in that Defendants do not disclose that the amounts members are paying are not just 'premiums' to pay for the actual insurance coverage, and the administrative expenses incurred by the AARP Trust, but a 4.95% commission on top of the premiums that AARP remits to UnitedHealth," that AARP is in any event not entitled to collect because it is not an insurance agent or broker, id. ¶¶ 65, 75; see also Pl.'s Opp'n at 43.
Even if the 4.95% charge is not a commission, however, the plaintiff alleges that the disclaimer nevertheless misrepresents what the amounts collected from consumers are used for, "obfuscat[ing] the cost of the Medigap premiums [and] leading reasonable consumers to pay more than what they otherwise would." Pl.'s Opp'n at 43 (citing Compl. ¶ 99). That is, the plaintiff alleges that if the defendants disclosed that consumers were being charged "premiums ... to pay expenses incurred by [AARP] Trust in connection with the insurance programs and to pay the insurance company for [consumer's] insurance coverage," Compl. ¶ 64, and a 4.95% charge (on the amount of the premium) to satisfy UnitedHealth's obligation to "pay[ ] royalty fees to AARP for the use of its intellectual property.... [which] fees are used for the general purposes of AARP," Compl. ¶¶ 5, 67, they would not be misled because they would reasonably understand that their "premiums" included a specific charge-calculated as a percentage of those premiums-paid solely to AARP and unconnected to their insurance coverage. See Pl.'s Opp'n at 43.
The defendants' disclosure regarding that charge, "included on correspondence to" the plaintiff and other consumers, Compl. ¶ 67, according to the plaintiff, is misleading on its own. See Pl.'s Opp'n at 45 n.19; Compl. ¶¶ 62-65. The disclosure indicates that "UnitedHealthcare Insurance Company pays royalty fees to AARP for the use of its intellectual property. These fees are used for the general purposes of AARP." Compl. ¶¶ 5, 67. This disclosure is allegedly "false and misleading" by failing to inform consumers that they, and not UnitedHealth, will be required to pay this "royalty." Id. ¶ 5. Nor does the disclosure inform consumers that the "royalty" is *41 equivalent to 4.95% of their premiums. Id. ¶¶ 5, 67. Again, nowhere does AARP disclose that any portion of the "premiums" is in fact used to pay the "royalties" UnitedHealth is obligated to pay AARP. See id. ¶¶ 65, 62 ("[W]hile AARP and UnitedHealth disclose the existence of a payment in general to AARP-which they term a 'royalty' paid for the use of AARP's intellectual property-they hide the fact that the cost of AARP Medigap insurance includes a percentage-based commission to AARP, funded by consumers (and not UnitedHealth), in addition to the insurance premium paid to UnitedHealth for coverage.") (emphasis in original).
Based on these allegations, the plaintiff has sufficiently alleged that both misrepresentations, independently but even more so when considered together, would be misleading to the reasonable consumer. Contrary to the statement made in the AARP Medigap disclaimer, royalties owed by UnitedHealth are neither "expenses incurred by [AARP] Trust" nor payment to UnitedHealth for "insurance coverage." Compl. ¶ 64. Especially in combination with the defendants' representations elsewhere that UnitedHealth pays "royalty fees" to AARP for "use of its intellectual property" and that such fees are "used for the general purposes of AARP," id. ¶ 5, the plaintiff has sufficiently alleged that a consumer may lack information to understand that UnitedHealth satisfied its contractual obligations to AARP by including an additional, percentage-based charge as part of the premium. See Pl.'s Opp'n at 45-46; Compl. ¶¶ 64-67.
Having concluded that the plaintiff sufficiently alleged that the two statements were misleading, the Court also concludes that she has sufficiently alleged that they were material. A matter is material if: "a reasonable [person] would attach importance to its existence or nonexistence in determining his or her choice of action in the transaction in question; or the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in his or her choice of action, although a reasonable [person] would not so regard it." Saucier , 64 A.3d at 442 (internal alterations omitted) (quoting RESTATEMENT OF THE LAW (SECOND) TORTS § 538(2) ).
Based on the disclosures the plaintiff quotes in her Complaint, a reasonable consumer could lack information to understand that: (1) a portion of her premiums satisfied UnitedHealth's obligation to pay royalties to AARP; (2) such royalties were calculated as a percentage of what she paid for Medigap coverage; and (3) the operable percentage was 4.95%. This additional charge was billed to the plaintiff as part of her premium, the price of which, as already noted, is generally the sole differentiating factor among Medigap policies. This price, and its components, are factors that a reasonable person would likely attach importance to in determining whether to buy a Medigap policy and whether to buy an AARP-sponsored one. Therefore, these factors may likely be material to a reasonable consumer.
At this stage, regardless of whether the 4.95% charge is properly deemed a "royalty" rather than a "commission," the plaintiff has stated a claim under the CPPA based on the defendants' allegedly materially misleading representations concerning the 4.95% charge.
With respect to the second and third categories of alleged misrepresentations and unfair or deceptive practices, concerning whether the defendants are de facto or unlicensed insurance agents of UnitedHealth and whether the 4.95% royalty, paid as a percentage of premiums, qualifies as a commission that may not lawfully be collected by AARP under District *42 of Columbia law, see Compl. ¶ 96, the plaintiff notes that "it is well-established under the CPPA that 'a merchant that presents misleading information about its services in violation of another statute commits an unlawful trade practice, even if that statute is not specifically enumerated elsewhere in the CPPA," Pl.'s Mem. at 43-44 (citing Mann , 251 F.Supp.3d at 121 ; Osbourne , 727 A.2d at 325-26 ). The plaintiff argues that if the defendants solicit insurance without being licensed to do so, they are misleading consumers about the services they are authorized by law to perform in violation of the CPPA. Compl. ¶ 96 Further, because AARP is not licensed as an insurer, it is not legally allowed to collect a commission. Id. The plaintiff alleges that AARP's disclosures regarding the 4.95% charge misled consumers by leading them to believe that the charge is part of the premiums paid to UnitedHealth rather than a commission AARP would not otherwise be authorized to collect. See id. ¶¶ 6, 62-65, 96-97.
District of Columbia law bars the payment or receipt of commissions in consideration for the sale, solicitation, or negotiation of insurance if the person paid was required to be licensed and was not. D.C. CODE § 31-1131.13. Persons who sell, solicit, or negotiate insurance must be licensed to do so. Id. § 31-1131.03. Key terms in this statutory provision are further defined, with "Sell" defined to mean "to sell or exchange a contract of insurance by any means, for money or its equivalent, on behalf of an insurance company," id. § 31-1131.02(16), and "Solicit" defined to mean "attempting to sell insurance or asking or urging a person to apply for a particular kind of insurance from a particular company," id. § 31-1131.02(17). "Commission" is not defined. See id. § 31-1131.02 (the definitions section for insurance regulations).
The defendants are not licensed insurance agents. Despite this, the plaintiffs allege that the defendants have agreed to: (1) market, solicit, sell and renew AARP Medigap policies with UnitedHealth; (2) collect and remit premium payments on behalf of UnitedHealth; (3) generally administer the AARP Medigap program; and (4) otherwise act as UnitedHealth's agent. Id. ¶ 38. In addition, AARP owns all solicitation materials related to the Medigap program. Id. ¶ 47, and its advertisements plainly state "This is a solicitation of insurance," id. ¶ 51. Further, in exchange for AARP's services on behalf of UnitedHealth, it "earns a 4.95% commission-disguised as a 'royalty'-on each policy sold or renewed." Id. ¶ 45.
Although District of Columbia law does not define "commission," the plaintiff has adequately alleged that the defendants solicit insurance without being licensed to do so and that the 4.95% charge, calculated as a percentage of premiums, represents the payment or receipt of "a commission, service fee, brokerage fee, or other valuable consideration" for the sale, solicitation, or negotiation of insurance, which is prohibited if the person paid was required to be licensed and was not. D.C. CODE § 31-1131.13. The plaintiff has also sufficiently alleged that the defendants' advertisements and disclaimers concerning that charge and their role in soliciting insurance misled consumers about the services they are legally authorized to perform and their right to receive payment in consideration for the sale of insurance. See Mann , 251 F.Supp.3d at 126 (holding that whether a business's "statements implied that it was licensed in D.C. is a question of fact for the jury").
Finally, the plaintiff has adequately alleged that the defendants' statements obscuring AARP's status as an unlicensed insurance agent that was not entitled to *43 receive a commission were material, because had she understood that AARP received an unlawful commission for each sale, she would have sought a lower-priced Medigap insurance policy or one sold by a company that complied with District of Columbia laws. See Compl. ¶¶ 81-83. Therefore, as to the second and third categories of misstatements, the plaintiff has sufficiently alleged that the defendants have committed an unfair trade practice in violation of the CPPA.
Accordingly, the defendants' motion to dismiss Count I is denied.
2. Count Two States a Claim of Conversion
In Count Two, the plaintiff alleges conversion of her ownership right to the 4.95% of her payments that was wrongfully charged and illegally diverted to AARP as a commission. Id. ¶¶ 104-07. She contends that the defendants "wrongly asserted dominion" over 4.95% of her payments, id. ¶ 106, and that she is entitled to damages in the amount for which she was wrongfully charged, id. ¶ 107.
As a general principle, conversion is defined as "any unlawful exercise of ownership, dominion or control over the personal property of another in denial or repudiation of [her] rights thereto." Hall v. District of Columbia , 867 F.3d 138, 151 (D.C. Cir. 2017) (internal quotation marks omitted) (quoting Chase Manhattan Bank v. Burden , 489 A.2d 494, 495 (D.C. 1985) ). "[M]oney can ... be the subject of a conversion claim 'if the plaintiff has the right to a specific identifiable fund of money.' " Papageorge v. Zucker , 169 A.3d 861, 864 (D.C. 2017) (quoting McNamara v. Picken , 950 F.Supp.2d 193, 194 (D.D.C. 2013) ).
The defendants contend that the plaintiff's conversion claim fails because she has not identified the right to any specific identifiable source of money. See Defs.' Mem. at 45 & n.11 (citing McNamara , 950 F.Supp.2d at 194 ). This is incorrect. The plaintiff's Complaint alleges that for every AARP Medigap policy sold or renewed, AARP Trust collects premium payments that include the 4.95% charge, Compl. ¶ 54, that AARP Trust then deducts funds equivalent to the 4.95% charge and remits that amount to AARP, Inc. and ASI, with 8% going to ASI and 92% going to AARP, Inc., id. ¶¶ 55, 57, and that the Agreement AARP has with UnitedHealth clearly delineates between the amount billed and paid by consumers, referred to as "Member Contributions," and the premiums remitted to UnitedHealth, referred to as "SHIP Gross Premiums," id. ¶ 58. The plaintiff alleges that she has a right to the money accumulated as a result of the 4.95% charge-namely: Member Contributions minus SHIP Gross Premiums. The Court is persuaded that this rationale sufficiently alleges a right to a specific, identifiable source of money.
The plaintiff also sufficiently alleges that the defendants' assertion of dominion over this source of funds was wrongful. As noted elsewhere, the plaintiff has adequately alleged that she was misled into paying the 4.95% charge because she did not understand that 4.95% of her premiums were being used to make allegedly unlawful commission payments, and, had she understood the nature of the arrangement, she would have sought other coverage. The defendants' motion to dismiss this claim is therefore denied.
3. Count Three States a Claim of Unjust Enrichment
In Count Three, the plaintiff alleges unjust enrichment based on allegations that she conferred a benefit on defendants "in the form of the hidden 4.95% charge on top of [her] monthly premium payments that [was] unlawfully and deceptively charged and illegally diverted to *44 AARP as a commission," id. ¶ 109, that the defendants "voluntarily accepted and retained this benefit," id. ¶ 110, which was "collected without proper disclosure and amounted to a commission in violation of" District of Columbia law, id. ¶ 111, and that it would be "inequitable" for the defendants to retain the benefit without paying its value to the plaintiff, id.
An unjust enrichment claim under District of Columbia law requires the plaintiff to allege that she (1) conferred a benefit on the defendants; (2) the defendants retained the benefit that was conferred; and (3) it would be unjust for the defendant to retain the benefit under the circumstances. See Euclid St., LLC v. D.C. Water & Sewer Auth. , 41 A.3d 453, 463 n.10 (D.C. 2012). The doctrine applies "when a person retains a benefit (usually money) which in justice and equity belongs to another." Falconi-Sachs v. LPF Senate Square, LLC , 142 A.3d 550, 556 (D.C. 2016) (internal quotation marks omitted) (quoting Jordan Keys & Jessamy, LLP v. St. Paul Fire & Marine Ins. Co. , 870 A.2d 58, 63 (D.C. 2005) ).
The plaintiff undisputedly conferred on the defendants a benefit they retained. See Defs.' Mem. at 46 (conceding that the defendants retained a benefit). The defendants argue, however, that the plaintiff cannot show that any benefits were retained unjustly because the "premium paid by Plaintiff afforded her the exact coverage she elected when she purchased the policy, and the royalty paid by United[Health] to AARP was simply a[ ] [fully disclosed] expense incurred by United[Health] in licensing intellectual property from AARP for its operation of the program." Id. Further, the defendants note that the plaintiff "received precisely the Medigap coverage she purchased at the rate mandated." Id.
The plaintiff does not contest the coverage she received, but insists that, under the circumstances, the defendants retained 4.95% of her premiums unjustly. Specifically, she argues the defendants are not insurance agents and cannot retain a commission, yet nevertheless collected 4.95% of her premium without proper disclosures or licensing. Pl.'s Opp'n at 48-50. Regardless of whether the charge is a "commission" or not, the plaintiff alleges that she was deceived regarding the cost and purposes of her premiums. She understood these premiums to amount to a sum certain, which sum would be used to pay expenses incurred by AARP Trust in connection with her Medigap program and to pay UnitedHealth for the coverage itself. Compl. ¶ 64. Yet a portion of those premiums in fact satisfied UnitedHealth's obligations to pay "royalties" to AARP-a fact that she alleges was never fully disclosed and that would have affected how she compared Medigap policy rates. See id. ¶ 11.
Given these allegations of misrepresentation, the defendants' argument that no unjust enrichment claim exists when the plaintiff received her coverage as expected and was told that UnitedHealth paid royalties to AARP erroneously assumes the plaintiff understood (or did not care) that such royalties were paid as a percentage of the plaintiff's premiums. The plaintiff plainly alleges she did not understand this fact and that it was material to her.
The D.C. Circuit, in an analogous context, held that plaintiffs had properly stated an unjust enrichment claim when they alleged that they were misled into paying a special assessment fee because they believed payment of such fee was necessary to retain membership in an organization. See In re APA Assessment Fee Litig. , 766 F.3d at 48. In fact, the fee was used to pay for lobbying services. Id. at 47. The defendants' argument that such lobbying services *45 were performed adequately was accordingly no barrier to the plaintiffs' claims, which rested, as do the plaintiff's claims here, on an allegation that the purpose of the payment was misrepresented to them. Id. at 48 ; see also id. at 47 (holding that a theory of "mistaken payment of money not due" is "one of the core cases of restitution") (internal quotation marks, alterations, and citation omitted).
Under the circumstances, the plaintiff has sufficiently alleged that the defendants unjustly retained money accrued as a result of the 4.95% charge. The defendants' motion to dismiss this claim is thereby denied.
4. Count Four States a Claim of Fraudulent Misrepresentations or Omissions
The plaintiff titles her claim in Count IV "Fraudulent Concealment" and alleges that the defendants "concealed or failed to disclose [the] material fact ... that AARP was collecting a 4.95% commission," Compl. ¶ 113, that AARP "knew or should have known that this material fact should be disclosed or not concealed," id. ¶ 114, that the defendants concealed the fact "in bad faith," id. ¶ 115, and in spite of their "duty to speak," id. ¶ 118, and that the defendants thereby "induced [the plaintiff] to act by purchasing an AARP-endorsed Medigap plan," id. ¶ 116. The plaintiff alleges that she suffered damages as a result of this fraudulent concealment, id. ¶ 117.
At the outset, the defendants rebut the plaintiff's fraudulent concealment claim relying solely on cases addressing the claim in the context of whether the statute of limitations should be tolled. See Defs.' Mem. at 48 n.13 (citing Larson v. Northrop Corp. , 21 F.3d 1164, 1172 (D.C. Cir. 1994) ; Quick v. EduCap, Inc. , 318 F.Supp.3d 121, 143 (D.D.C. 2018) ; Woodruff v. McConkey , 524 A.2d 722, 728 (D.C. 1987) ). Indeed, generally, a plaintiff need not assert a fraudulent concealment claim in the Complaint until after the defendant has answered asserting a statute of limitations affirmative defense. See Firestone , 76 F.3d at 1210. The source of the confusion may be the plaintiff's reliance on Howard University v. Watkins , 857 F.Supp.2d 67 (D.D.C. 2012) for the elements of a fraudulent concealment claim under District of Columbia law, see Pl.'s Opp'n at 50 (citing Howard Univ. , 857 F.Supp.2d at 75 ). Howard University , in turn, cites for the elements of this claim another case, Alexander v. Washington Gas Light Co. , 481 F.Supp.2d 16, 36-37 (D.D.C. 2006), which outlined the elements of a fraudulent concealment claim under Maryland law. The plaintiff's fourth claim is assumed to be pleading a related claim for fraudulent misrepresentations or omissions under District of Columbia law, which requires showing that the defendant: "(1) made a false representation of or willfully omitted a material fact; (2) had knowledge of the misrepresentation or willful omission; (3) intended to induce another to rely on the misrepresentation or willful omission; (4) the other person acted in reliance on that misrepresentation or willful omission; and (5) [the other person] suffered damages as a result of that reliance." Sundberg , 109 A.3d at 1130-31 (internal alterations quotation marks, alterations, and citations omitted). A false representation may be either an affirmative misrepresentation or a failure to disclose a material fact when a duty to disclose that fact has arisen. Id. at 1131.
Fraudulent misrepresentation claims are subject to the heightened pleading standard under Federal Rule of Civil Procedure 9(b), requiring a plaintiff to plead "with particularity the circumstances constituting fraud or mistake,"
*46 FED. R. CIV. P. 9(b).[14] Intent, however, may be pleaded generally. Id. The information necessary to establish a fraud claim often includes "specific fraudulent statements, who made the statements, what was said, when or where these statements were made, and how or why the alleged statements were fraudulent." Brink v. Cont'l Ins. Co. , 787 F.3d 1120, 1127 (D.C. Cir. 2015) (internal quotation marks and citation omitted). "[T]he point of Rule 9(b) is to ensure that there is sufficient substance to the allegations to both afford the defendant the opportunity to prepare a response and to warrant further judicial process." United States ex rel. Heath v. AT&T, Inc. , 791 F.3d 112, 125 (D.C. Cir. 2015).
The plaintiff has adequately pled the "who, what, where, when, and how" of her fraudulent misrepresentation claim. See Pl.'s Opp'n at 50 & nn.24-28. She has alleged that AARP, Inc., ASI, and AARP Trust, Compl. ¶¶ 2, 21, 22, concealed that 4.95% of plaintiff's premiums paid UnitedHealth's "royalties" to AARP, id. ¶¶ 5, 6, 62, 64, 67, that such misrepresentations and omissions were printed in documents sent to the plaintiff and published online, id. ¶¶ 5, 51, 67, that these misrepresentations have existed in some form since 1999, including when the plaintiff bought or renewed her policy, id. ¶¶ 40-45, 20, and that the plaintiff reasonably relied on the misrepresentations to her detriment because she would not have purchased a Medigap policy whose premiums included a "royalty" charge, but instead would have purchased a lower-priced policy offering identical benefits, id. ¶¶ 20, 79, 81. Those allegations are sufficient, at this stage of the proceedings, to state a claim for fraudulent misrepresentation or omission.
The plaintiff also adequately alleges that the defendants failed to disclose a material fact-the nature and purpose of the 4.95% charge, which they had knowledge of-when a duty to disclose that fact had arisen. Under District of Columbia law, a party to a transaction has no duty of disclosure unless the party is a fiduciary to the other or the party knows that the other is acting unaware of a material fact that is unobservable or undiscoverable by an ordinarily prudent person upon reasonable inspection. Sandza v. Barclays Bank PLC , 151 F.Supp.3d 94, 107 (D.D.C. 2015). One party's "superior knowledge can give rise to a duty to disclose," id. , or such duty may arise "as a result of a partial disclosure," Intelect Corp. v. Cellco P'ship GP , 160 F.Supp.3d 157, 187 (D.D.C. 2016) (internal quotation marks and citation omitted). The plaintiff alleges that defendants had a "duty to speak given that they were parties to transactions with [plaintiff] ... [and] had a duty to say enough to prevent their words from misleading [plaintiff] ... and they had special knowledge about the material[ ] facts that [plaintiff] ... did not possess." Compl. ¶ 118.
The defendants suggest that their public rate filings and disclosure that AARP received a 4.95% royalty from UnitedHealth were observable or discoverable by an ordinarily prudent person upon reasonable inspection, and therefore the plaintiff has failed to establish fraudulent misrepresentation. Defs.' Mem. at 48-49. In general, "examining readily available public records [is] part of the responsibility of an 'ordinarily prudent person' conducting a 'reasonable inspection,' and ... failure to perform this basic due diligence preclude[s] a fraud claim."
*47 Sununu v. Philippine Airlines, Inc. , 792 F.Supp.2d 39, 52 (D.D.C. 2011). Here, however, the plaintiff has adequately alleged that the defendants' disclaimer that UnitedHealth paid AARP a "royalty" was only a partial disclosure, as it did not sufficiently alert consumers to the undiscoverable or unobservable fact that they were being charged 4.95% of their premiums in order to satisfy that obligation. See Compl. ¶ 67. Moreover, the plaintiff further alleges that the defendants are so entwined in the solicitation of and administration of UnitedHealth's insurance policies that the defendants should be considered unlicensed insurance agents or brokers. See, e.g., id. ¶¶ 8, 47, 51, 73. While the Court declines to resolve that issue at this stage of the proceedings, allowing the plaintiff's claims to go forward will supplement the record as to whether this alleged role creates a fiduciary duty or any other duty to disclose. But see Attias v. CareFirst, Inc. , No. 15 cv-00882 (CRC), 365 F.Supp.3d 1, 22-23, 2019 WL 367984, at *16 (D.D.C. Jan. 30, 2019) (noting that District of Columbia generally considers the relationship between the insurer and the insured to be a contractual, rather than fiduciary relationship) (citing cases).
For the reasons already discussed, see supra Section III.E.1.d, the plaintiff has adequately alleged that the defendants' misrepresentations or omissions regarding the nature, cost, and purpose of the 4.95% charge may be material because they affected her understanding of the cost of her Medigap insurance. She has further sufficiently alleged that this misrepresentation was intended to induce consumers to purchase AARP-sponsored Medigap insurance over other policies that offered identical benefits, believing that their premiums paid only for "expenses incurred by [AARP] Trust in connection with the insurance programs and to pay the insurance company for [consumer's] insurance coverage," Compl. ¶ 64, obscuring the fact that consumers were also being charged a 4.95% "royalty" fee, and that she relied on AARP's partial disclosures in making her purchasing decisions, foregoing the chance to purchase insurance that did not include such charge.
The plaintiff's allegations sufficiently state a fraudulent misrepresentation or omission claim, and the defendants' motion to dismiss is therefore denied.
IV. CONCLUSION
For the foregoing reasons, the defendants' motion to dismiss, ECF No. 8, is denied as to all counts in the plaintiff's Complaint.
An Order consistent with this Memorandum Opinion will be entered contemporaneously.

Notably, the plaintiff made this argument before the Eleventh Circuit issued its opinion in Patel , holding that the filed-rate doctrine applies when an intermediary passes the cost of regulator-approved rates on to a third party. See 904 F.3d at 1322.

In reply, the defendants suggest that Section 148 of the Second Restatement concerning "fraud and misrepresentation," should be applied here rather than Section 145. See Defs.' Reply at 21-22. While the D.C. Court of Appeals has previously looked to Section 148 as a "useful framework for selecting the law which applies to multi-state misrepresentation claims," Hercules & Co., Ltd. v. Shama Restaurant Corp. , 566 A.2d 31, 43 (D.C. 1989), more recent cases primarily look to Section 145, see Washkoviak , 900 A.2d at 182 n.18 (relying on Section 145 but noting the result would be no different under Section 148); Jones v. Clinch , 73 A.3d 80, 82 (D.C. 2013) (citing Hercules but nonetheless relying on Section 145 when analyzing a CPPA claim alleging misrepresentation); see also In re APA Assessment Fee Litig. , 766 F.3d at 53-55 (following Washkoviak and conducting an analysis of choice of law for misrepresentation claims under Section 145, but concluding there would be no difference if the question were considered under Section 148); Margolis v. U-Haul Int'l, Inc. , 818 F.Supp.2d 91, 102 n.7 (D.D.C. 2011) (pointing to counsel's concession that "there is no case under the CPPA in the Superior Courts or in federal court that has ever applied [Section] 148") (internal alteration and quotation marks omitted); Mobile Satellite Commcn's, Inc. v. Intelsat USA Sales Corp. , 646 F.Supp.2d 124, 130 (D.D.C. 2009) (noting that the D.C. Court of Appeals "has applied [Section] 145 even in cases of fraudulent misrepresentation," and citing both Washkoviak and Hercules ). Given this background, the Court concludes that Section 145 provides the appropriate framework. The plaintiff's motion for leave to submit a surreply to address this argument (among others) is therefore unnecessary. See Pl.'s Mot. for Leave to File Surreply, ECF No. 17. Further, as the defendants note, see Defs.' Opp'n to Pl.'s Mot. for Leave to File Surreply at 4, ECF No. 18, the plaintiff has failed to attach her proposed surreply for the Court's consideration. See id. (citing Glass v. Lahood , 786 F.Supp.2d 189, 231 (D.D.C. 2011) (in which the plaintiff submitted her proposed surreply so that the Court could evaluate whether it was warranted); Crummey v. Soc. Sec. Admin. , 794 F.Supp.2d 46, 54, 63-64 (D.D.C. 2011) (same) ). Therefore, the plaintiff's Motion for Leave to File a Surreply is denied as both defective and unnecessary, since the issues the plaintiff seeks to address would not aid in the Court's resolution of the pending motion to dismiss.

As for the plaintiff's argument that she has alleged standing by virtue of asserting a violation of her statutory right to truthful information, the Court agrees with the defendants that this alleged violation, without more , is insufficient to establish standing. See Defs.' Mem. at 39-40; Pl.'s Opp'n at 37-38. "Although it might violate the CPPA to present misleading information even if no one was misled, a private plaintiff cannot bring a suit in federal court to enforce that claim unless he or she has suffered an injury in fact." Mann v. Bahi , 251 F.Supp.3d 112, 119 (D.D.C. 2017) (citing Spokeo, Inc. v. Robins , --- U.S. ----, 136 S.Ct. 1540, 1548, 194 L.Ed.2d 635 (2016) ). The plaintiff does not have standing unless she can allege that the defendants violated the CPPA and that she suffered an injury in fact as a result. See Hancock v. Urban Outfitters, Inc. , 830 F.3d 511, 514 (D.C. Cir. 2016) ; Silvious v. Snapple Beverage Corp. , 793 F.Supp.2d 414, 417 (D.D.C. 2011) (collecting cases for the proposition that "a lawsuit under the CPPA does not relieve a plaintiff of the requirement to show a concrete injury-in-fact to himself").

The plaintiff lacks standing, however, to pursue injunctive relief under the CPPA, see Compl. ¶ 103, because she does not allege that she is currently enrolled in an AARP Medigap policy. See Owner-Operator Indep. Drivers Ass'n, Inc. v. U.S. Dep't of Transp. , 879 F.3d 339, 346 (D.C. Cir. 2018) (plaintiffs must demonstrate standing separately for each form of relief sought, and standing for prospective relief requires showing continuing or imminent harm); Levay , 2018 WL 3425014, at *3 (holding that plaintiffs lacked standing to pursue injunctive relief when they had not alleged how they would continue to be harmed by AARP's misrepresentations concerning the Medigap policies).

By contrast, claims alleging violations of the CPPA are not subject to this heightened pleading standard. See, e.g., Frese v. City Segway Tours of Wash., D.C. , 249 F.Supp.3d 230, 235 (D.D.C. 2017) ; McMullen , 164 F.Supp.3d at 90-91 ; Campbell v. Nat'l Union Fire Ins. Co. of Pittsburgh , 130 F.Supp.3d 236, 267 (D.D.C. 2015) (collecting cases).