**Jeffrey R. HORN, et al., Plaintiffs,**

v.

**TRANSCON LINES, INC., et al., Defendants,**

**and**

**R.L. JEFFRIES TRUCKING CO., INC., Defendant and Third–Party Plaintiff–Appellee,**

v.

**Mary F. THURMOND, Personal Representative of the Estate of Thomas B. Thurmond, Third–Party Defendant and Plaintiff–Appellee,**

v.

**LIBERTY MUTUAL INSURANCE COMPANY, Third–Party Defendant–Appellant.**

No. 93–1576.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 29, 1993.

Decided Oct. 20, 1993.

Stephen H. Thomas (argued), Statham, Johnson & McCray, Daniel F. Hewins, Hewins & Hewins, David V. Miller (argued), Bowers, Harrison, Kent & Miller, Evansville, IN, Henry C. Neel, Neel & Wilson, Henderson, KY, for defendant-appellee.

Donald R. Wright (argued), Wright, Evans & Daly, Evansville, IN, for defendant-appellant.

Before FLAUM, EASTERBROOK, and KANNE, Circuit Judges.

EASTERBROOK, Circuit Judge.

While hauling a load of freight for R.L. Jeffries Trucking Company, Thomas B. Thurmond drove his rig off the road. Thurmond died, and his passenger Jeffrey Horn was seriously injured. The district court held in this diversity litigation that, at the time of the accident, Thurmond was covered by a policy of insurance issued by Liberty Mutual Insurance Company. Our prior opinion in this case, 898 F.2d 589 (7th Cir.1990), rebuffed an attempt to take an appeal under Fed.R.Civ.P. 54(b). Since then the district court has resolved the questions that, we held, made appeal premature: whether Horn is entitled to damages and, if so, how much, and whether Liberty Mutual is liable for "bad faith" in its handling of the litigation. Under the district court's final judgment Horn is entitled to damages; Jeffries, which paid Horn, is entitled to indemnity of $518,-000 from Thurmond's estate, which Liberty Mutual must pay on the estate's behalf; Thurmond's estate is entitled to an additional $34,000 from Liberty Mutual for the costs of defense and the value of the tractor-trailer, which was destroyed in the accident; but Liberty Mutual is not liable for bad faith. Liberty Mutual has appealed, contending that its policy did not cover Thurmond while the truck was laden, and that its liability in any event may not exceed $500,000, the limit of the policy.

Thurmond had leased his truck to Transcon Lines, Inc., which provided insurance while the equipment was being used "under and pursuant to dispatch instructions of the lessee". The lease permitted Transcon to sublease the rig to other companies for particular trips. Although the parties anticipated that owner-drivers such as Thurmond would scare up these loads, the power to accept or reject a one-trip sublease resided in Transcon—in part because regulations of the Interstate Commerce Commission require it, and in part because Transcon needed to protect its own interests. Transcon maintained a list of carriers with which it would not deal in trip leases; Jeffries was on this "no load" list because it had refused to cooperate with Transcon in preparing the paperwork necessary to account for state road and gasoline taxes (and had not paid its share of these taxes). Thurmond nonetheless continued dealing with Jeffries. In order to do this he had to deceive Transcon. In October 1985 Thurmond told Transcon (whose headquarters is in California) that he was taking his tractor-trailer "off dispatch" so that he could

return home to Kentucky and make repairs. In fact, he furnished his truck and services as a driver to Jeffries (and, apparently, at least one other carrier). While hauling a load for Jeffries in Indiana, Thurmond had the accident that precipitated this litigation. It is common ground among the parties that the insurance Transcon provided for approved operations does not cover these events.

Jeffries insisted that persons who supplied transportation for its cargoes also supply insurance. To convince Jeffries that he had coverage, Thurmond displayed a "Certificate of Automobile Insurance" issued by Liberty Mutual. This certificate, which recites that it was issued "9/9/85 at Woodland Hills, CA" to "Specified Lessors To Keystone Lines", describes Thurmond as an "additional insured" and identifies Thurmond's tractor and trailer as the insured vehicles. According to the certificate, Thurmond had "Bodily Injury & Property Damage Combined Single Limit" of $500,000. The certificate implies that Thurmond has general liability insurance for the operation of the truck but adds: "The insurance afforded by the listed policy(ies) is subject to all their terms, exclusions and conditions".

Thurmond knew, though Jeffries did not, that the coverage Thurmond had acquired through Keystone (one of Transcon's subsidiaries) did not apply. When not hauling freight for Transcon, Thurmond was supposed to furnish his own insurance. This meant, if Thurmond had adhered to the terms of the lease, that he needed insurance while "deadheading" and "bobtailing"—running empty back home or to the place where he was to pick up the next load. As a service to its lessors, Transcon secured a group policy to cover deadheading and bobtailing, offering the coverage to any lessor willing to pay the premium of $22 per month. Thurmond signed up, and Transcon mailed him the certificate (which Liberty Mutual had furnished) as evidence of his insurance under the group policy. But the certificate does not spell out or even hint at the severe limitations on the scope of the insurance. This is why Jeffries was willing to accept it as proof of insurance, and it is the genesis of the district court's holding that Liberty Mutual must indemnify Thurmond's estate in this case.

■ Sitting in Indiana, the district court properly applied Indiana's choice of law rules. *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Older Indiana case law refers to the law of the place in which the last act necessary to create a binding agreement took place. *W.H. Barber Co. v. Hughes,* 223 Ind. 570, 581, 63 N.E.2d 417, 421 (1945). Liberty Mutual says that that place is Kentucky, because Transcon mailed the certificate to Thurmond's home there. If not Kentucky, Liberty Mutual believes, then the right state is Indiana, where the accident occurred and which, Liberty Mutual says, has more "contacts" with this dispute than does any other state. See *Coldwell Banker & Co. v. Karlock,* 686 F.2d 596, 600 (7th Cir.1982) (concluding that Indiana today follows the "most significant relationship" approach in contract as well as tort cases). Neither Kentucky nor Indiana is a plausible source of law for interpreting the certificate and policy, however. Indiana has no "contacts" of any kind with the insurance. Liberty Mutual is a Massachusetts insurer, which issued a group policy to Transcon, a company with headquarters in California whose business is providing transportation from coast to coast. Coverage was bound in California, and that binder was the last act necessary to make the insurance effective. Alternatively one might say that the receipt of the first premium (by Transcon from Thurmond, or by Liberty Mutual from Transcon) was the last act necessary to put the coverage into force, but these acts also occurred in California. (Transcon deducted the $22 from sums otherwise due to Thurmond and remitted the premium to Liberty Mutual.) These events also establish that California has the "most significant relationship" to the dispute.

There is only one policy and one form of certificate evidencing coverage. We cannot imagine why Liberty Mutual would prefer a choice-of-law approach under which 50 different rules govern the same policy of insurance, depending on the home of the owner-driver or the location of the accident. Stable

and predictable rules of law are especially valuable for firms with multi-state operations. When pressed on this subject at oral argument, Liberty Mutual's lawyer could not give a reason why it would be in his client's long-run interest to have such a fractured and uncertain legal system. Liberty Mutual might fare better in *this* case under Kentucky law than under California law, but that it is not a satisfactory reason to select one rather than the other. Like the district court, we hold that California supplies the governing law.

■ Section 381(d) of the California Insurance Code provides that a policy of insurance shall describe "[t]he risks insured against." Section 383.5 then specifies that the requirements of § 381 apply to a "certificate evidencing insurance under a master policy." What happens when a certificate does not describe the principal risks insured against, as the certificate issued to Thurmond did not? The statute is silent, but several cases hold that the insurer may not enforce vital limitations or exclusions missing from the certificate. *Espree v. Western Pioneer Insurance Co.*, 159 Cal.App.2d Supp. 875, 324 P.2d 749 (1958); *Allstate Insurance Co. v. Dean*, 269 Cal.App.2d 1, 76 Cal.Rptr. 543 (1969); see also *Frieze v. West American Insurance Co.*, 188 F.2d 331 (8th Cir.1951). Although these cases are the centerpiece of Thurmond's argument and the district court's holding, Liberty Mutual ignored them until its reply brief, effectively conceding that if they supply the governing rule, it loses. A litigant wanting to challenge the core of the district court's holding must do so in its opening brief and not hold its fire until after the appellee has filed its only brief. *Bloyer v. Peters*, 5 F.3d 1093, 1093 (7th Cir.1993); *Wilson v. O'Leary*, 895 F.2d 378, 384 (7th Cir.1990). Liberty Mutual similarly has forfeited the argument, made on appeal for the first time in this long-running litigation, that Thurmond's knowledge of the master policy's scope precludes the application of *Espree* and *Dean.*

Liberty Mutual has, however, preserved its argument that an addition to the Code in 1978 changed the law. Section 384 says that every "certificate ... provided as evidence of insurance" shall contain a statement "or words to the effect of: 'This certificate ... is not an insurance policy and does not amend, extend or alter the coverage afforded by the policies listed herein.... [T]he insurance afforded by the policies described herein is subject to all of the terms, exclusions and conditions of such policies.'" Liberty Mutual submits that the language in the certificate furnished to Thurmond satisfies this requirement and permits it to limit coverage to deadheading and bobtailing.

Section 384 supposes not only that the certificate describes the general nature of the coverage, making it appropriate to rely on the full policy for the details, but also that there *is* a policy, ready to be consulted by a person seeking to know the full terms. The certificate sent to Thurmond was so misleading that the contents of the master policy cannot be called details or elaborations. What is more, someone wanting to consult Liberty Mutual's master policy in October 1985 would not have had much success, for, although the insurance had been bound, the policy had not been issued. There was no formal "policy" until the spring of 1986. As of the date of the accident, the certificate *was* the policy, rather than just evidence of coverage under some more elaborate document. Liberty Mutual simply ignores this problem. Section 384 therefore does it no good, and we need not speculate whether the courts of California would conclude that this law overturns the holdings of *Espree, Dean,* and similar cases.

■ All that remains is determining how much Liberty Mutual owes. The certificate and the policy agree that the limit is $500,000. The district judge nonetheless ordered Liberty Mutual to pay $517,561.28 to cover Horn's injuries, $13,656.50 to reimburse Thurmond's estate for the attorneys' fees it incurred in defending the suit, and $21,099.77 for the value of the tractor and trailer. The court also awarded prejudgment interest on these sums. The court did not explain how this judgment can be reconciled with the policy. Appellees contend that Liberty Mutual has waived this contention, too, but it is hard to see what the insurer needed to do other than to inform the district judge about

the cap. At one point Thurmond's estate was arguing that Liberty Mutual's bad faith refusal to defend the litigation justified a judgment higher than $500,000, including compensatory and punitive damages. Liberty Mutual denied that it was liable for any sum in excess of $500,000, and the estate eventually dismissed this claim by stipulation. Since the whole point of the bad-faith claim was to set up the possibility that recovery would exceed $500,000, the dismissal of the claim should have led the district court to enforce the policy's limit.

Because the policy created separate obligations to defend and indemnify, Liberty Mutual properly may be required to reimburse Thurmond's estate for the expense of defense. Indemnification of the estate's loss, however, is limited to $500,000. The parties have not informed us whether, under the policy, prejudgment interest is included in the $500,000 or comes on top of it. Accordingly the judgment is vacated, and the case is remanded so that the district court may redetermine the final award consistently with this opinion.