In the

# United States Court of Appeals
### For the Seventh Circuit

———————————

No. 19-2898

CARLTON GUNN,

*Plaintiff-Appellant,*

*v.*

CONTINENTAL CASUALTY COMPANY,

*Defendant-Appellee.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:18-cv-03314 — **Charles P. Kocoras**, *Judge.*

———————————

ARGUED APRIL 15, 2020 — DECIDED AUGUST 5, 2020

———————————

Before MANION, HAMILTON, and BARRETT, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Most appellate opinions try to
answer questions of law. This opinion is an exception. We ask
many more questions than we can answer here. They concern
choice-of-law principles as applied to the unique challenges
of interstate regulation of insurance in the United States, and
more specifically as applied to a group insurance policy is-
sued in one jurisdiction to an employer with employees in
every state. We realize we are leaving a good deal of work for

the capable district judge on remand. We hope he will receive help on choice-of-law issues from counsel for the parties and interested amici curiae.

Plaintiff Carlton Gunn brought this case as a putative class action against defendant Continental Casualty Company, which issued a group long-term care insurance policy to Gunn's employer, the federal judiciary, in Washington D.C. Gunn alleged that Continental breached its contract, committed torts, and violated consumer protection laws by raising his premiums dramatically. Continental persuaded the district court to dismiss the case on the pleadings based on its assertion of a filed-rate defense, relying on the Washington state Insurance Commissioner's approval of the new, higher premiums for individual insureds in Washington. The parties' briefs in the district court and on appeal raised the issue of choice of law but offered little help in resolving it.

The appellate briefs and arguments make clear that choice of law is critical in this case, but they leave too many unanswered questions. Which state's or states' law creates Gunn's causes of action? Does that jurisdiction recognize an applicable filed-rate defense, and if so, what are its contours? Which state or states have authority to approve premium rates under the group policy? If one state otherwise offers Gunn a remedy but another state with authority has approved Continental's rates, which state's authority controls and which must yield, and why? We raised these and other questions in oral argument, but without satisfactory answers. Given their importance to the larger framework of multistate insurance regulation, we conclude that the best resolution of this appeal is to let the adversary process take its course, with some general direction from us to ensure that the adversaries focus on the

critical issues. We therefore reverse and remand for further proceedings.

I.  *Plaintiff's Claims and Procedural Background*

Contracts for group insurance are in essence three-party contracts. Steven Plitt et al., 1A *Couch on Insurance 3d* § 7:1 (1995 & supp. 2019). "A group insurance policy is the contract between the insurer and an employer, … or some other central entity, for the benefit of a group of people that have some relationship to the central entity, such as employees." *Id.* The central entity, not the individual insured, holds the master policy and has "the chief contractual relationship with the insurer." *Id.* The individual insureds are considered third-party beneficiaries of the master policy and "typically receive certificates proving that they are insured and listing what coverage is provided." *Id.* For this reason, "the addition of new individual members to a master group policy does not create a new contract of insurance." *Id.* § 8:1. At the same time, individual insureds are usually not automatically covered by the central entity's master policy. They must individually elect coverage and pay their own premiums. *Id.* § 8:2.

For purposes of defendant's motion to dismiss, we assume the truth of the following factual allegations. In 1999, defendant Continental Casualty Company delivered a group long-term care insurance policy to the federal judiciary—specifically, to the Federal Judiciary Group Long Term Care Insurance Trust in Washington D.C. Long-term care insurance is intended to provide long-term financial security by covering a variety of services, not generally covered by Medicare or ordinary health insurance, for those unable to care for themselves due to age or disability. As with life insurance, the cost of long-term care insurance increases with

age. As Continental advertised for this policy, "the younger you are when your coverage begins, the lower your premiums will be for the duration of your participation in the plan."

In 2000, plaintiff Carlton Gunn was an assistant federal defender in the State of Washington eligible for coverage under the judiciary's policy. He purchased coverage under the policy, relying in part on Continental's representation in its marketing materials that it would raise premiums, if at all, only "for everyone in your age category who has the kind of coverage plan that you do." The master policy and Gunn's individual coverage certificate similarly promised that Continental would raise premiums "only if we change the premiums for all insureds in the same premium class." The master policy provided specifically that "Premium is computed as stated in the Master Application," which contained tables of premium rates according to payment schedule, age on effective date of coverage, and amount of daily benefit. No mention was made of rates varying based on the individual insured's state of residence.

To protect against the long-term effects of inflation on the policy's costs and benefits, Gunn also purchased what Continental called a "Lifetime Compound Automatic Benefit Increase benefit." That feature would "automatically increase the daily benefit for nursing home care that you select now by 5% annually on a compounded basis." "This means," Continental explained, "you will not need to worry about increasing your premium in the future." Purchasing the automatic benefit increase feature more than doubled Gunn's baseline premium.

Seventeen years later, Gunn received a letter from Continental informing him that his premium rates would rise by 25

percent each year for the next three years, adding up to a near doubling of the premium, from about $700 to about $1,400 annually. The letter also said that the effective dates of the increases would depend ultimately on the approval of "certain states," which might or might not be forthcoming at the same time, or at all. Gunn believes this geographic disparity breaches Continental's promise to raise rates only uniformly within a "premium class." He also contends he should be protected from the dramatic premium increases precisely because he had already paid to protect himself against inflation by buying the automatic benefit increase.

Gunn's complaint asserted claims for breach of contract, breach of implied covenant, unfair and deceptive practices under the District of Columbia's consumer protection statute, fraud, and fraudulent concealment. On behalf of himself and a putative class of insureds under the judiciary's group policy, Gunn sought rescission (whether of the master policy or his individual certificate, he did not say) and an injunction against further rate increases, or alternatively compensatory, statutory, and punitive damages.[1]

Continental moved to dismiss under Federal Rule of Civil Procedure 12(b)(6), arguing among other grounds that the complaint was barred by "the filed-rate doctrine." The federal version of that doctrine in general "forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate federal regulatory authority." *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 577 (1981). One way to put it is that the "reasonableness" of a rate is an

---

[1] No member of this panel is a member of the plan, so we would not be members of a potential plaintiff class.

administrative standard, not a justiciable legal right. *Montana-Dakota Utils. Co. v. Northwestern Pub. Serv. Co.*, 341 U.S. 246, 251 (1951). Another is that a buyer's consent to pay the filed rate is not necessary to create an obligation to pay the filed rate. *Lowden v. Simonds-Shields-Lonsdale Grain Co.*, 306 U.S. 516, 520–21 (1939). *Arkansas Louisiana Gas* itself held that a state-law action for breach of contract could not survive preemption based on a state court's "speculation" that the responsible federal regulator would have approved the higher rate for which the parties contracted instead of the lower rate it had actually approved. 453 U.S. at 573, 578–79.

States have adopted versions of this doctrine of varying breadth and force, some in statutes and some through case law. And even where different states' doctrines differ only in nuance, we have said that "nuance can be important." *In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1300 (7th Cir. 1995) (reversing certification of nationwide class whose claims were governed by many different states' laws).

Citing *Arkansas Louisiana Gas* and other cases, Continental argued that Gunn's individual certificate had been issued to him in the State of Washington; that the Washington insurance commissioner had authority to approve the rates Gunn was charged; and that Continental had sought and obtained the Washington commissioner's approval for the challenged rate increases. Gunn's suit, went the argument, amounted to a collateral attack on rates duly approved by the commissioner, so that the filed-rate doctrine prohibited courts from entertaining Gunn's claims. We confess that we were mystified when we realized that Continental's motion did not explain whether the filed-rate doctrine it invoked stems from federal or state law, let alone from which state's law.

In opposition, Gunn argued that the law of the District of Columbia does not recognize a version of the filed-rate doctrine that would bar his claims. Neither side's briefs to the district court engaged in a meaningful choice-of-law analysis, nor did they develop their competing assertions of legislative and regulatory jurisdiction over the rates Gunn should pay.

The district court also did not engage with the choice-of-law problem, but it agreed with Continental that Gunn's suit was the type of attack on duly approved rates generally barred by filed-rate rules and dismissed the complaint with prejudice. We have jurisdiction of the appeal under 28 U.S.C. § 1291.

II. *Analysis*

A. *The Choice-of-Law Problem*

We review de novo a grant of a motion to dismiss for failure to state a claim. *Warciak v. Subway Restaurants, Inc.*, 949 F.3d 354, 356 (7th Cir. 2020). A Rule 12(b)(6) motion tests "the legal sufficiency of a complaint," as measured against the standards of Rule 8(a). E.g., *Runnion v. Girl Scouts of Greater Chicago and Northwest Indiana*, 786 F.3d 510, 526 (7th Cir. 2015). It is the defendant's burden to establish the complaint's insufficiency. *Yeksigian v. Nappi*, 900 F.2d 101, 104 (7th Cir. 1990).

There is procedural problem in this case, however, that made defendant's use of Rule 12(b)(6) inappropriate. Continental did not actually challenge the complaint's sufficiency, at least by invoking the filed-rate doctrine. Continental instead advanced an affirmative defense, which it had the burden of pleading and proving. Fed. R. Civ. P. 8(c)(1) (burden of pleading); *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 645 (7th Cir. 2019) (burden of proving); see *E. &*

*J. Gallo Winery v. EnCana Corp.*, 503 F.3d 1027, 1039 n.11 (9th Cir. 2007) (filed-rate doctrine as affirmative defense). With a narrow and pragmatic exception for a plaintiff who has pleaded herself out of court, the appropriate vehicle for resolving an affirmative defense is a motion for judgment on the pleadings under Rule 12(c), not a Rule 12(b)(6) motion. *Benson*, 944 F.3d at 645; see also *Burton v. Ghosh*, 961 F.3d 960, 964–65 (7th Cir. 2020) (collecting cases); cf. *Brooks v. Ross*, 578 F.3d 574, 579 (7th Cir. 2009) (example of pragmatic exception where complaint unambiguously set forth dates establishing statute-of-limitations defense). "Observing the distinction is necessary to allocate correctly the burdens of pleading and proof," *H.A.L. N.Y. Holdings, LLC v. Guinan*, 958 F.3d 627, 632 (7th Cir. 2020), and serves an important notice function. *Burton*, 961 F.3d at 965, citing *Blonder-Tongue Labs., Inc. v. Univ. of Illinois Found.*, 402 U.S. 313, 350 (1971), among others.

In this case, Continental's filed-rate defense certainly drew on materials outside the complaint and was not appropriate for a Rule 12(b)(6) motion. Gunn did not plead himself out of court with one stray reference to the Washington state insurance commissioner, so an answer and motion under Rule 12(c), not a Rule 12(b)(6) motion, would have been the appropriate path to raise a filed-rate defense. We construe Continental's motion as one under Rule 12(c), and Continental bore the burden of showing that the allegations of the complaint and an answer showed that an affirmative defense conclusively defeated all of Gunn's claims as a matter of law. See *Alexander v. City of Chicago*, 994 F.2d 333, 336 (7th Cir. 1993).

Regardless of the procedural bobble, Continental had to address an indispensable threshold question: under the law of what sovereign was it entitled to judgment? Law "does not

exist without some definite authority behind it." *Black & White Taxicab & Transfer Co. v. Brown & Yellow Taxicab & Transfer Co.*, 276 U.S. 518, 533 (1928) (Holmes, J., dissenting). Claims and defenses have to come from somewhere. "Proof of [them] in the air, so to speak, will not do." *Palsgraf v. Long Island R.R. Co.*, 162 N.E. 99, 99 (N.Y. 1928). Yet that has basically been Continental's approach.

In support of its motion to dismiss, Continental assumed without argument that the applicable law was Washington's, though Gunn pleaded at least one cause of action arising under a statute of the District of Columbia. On appeal, Continental asserts, again without argument, that Washington law creates Gunn's causes of action and, astonishingly, claims that "federal common law" creates its filed-rate defense. But Continental does not argue for federal preemption.[2] Nor does the

---

[2] Chief Judge Howell denied dismissal in a recent case similar to Gunn's, noting that a filed-rate defense "typically" has a basis in federal statute and in that context "supports the supremacy of federal regulation over certain federal as well as state and common law claims." *Krukas v. AARP, Inc.*, 376 F. Supp. 3d 1, 18 (D.D.C. 2019). In *Krukas*, the court assumed for purposes of argument that some version of a filed-rate doctrine could apply to insurance regulation and denied dismissal because the plaintiff did not directly challenge any regulated rates. *Id*. at 20–26. Federal law leaves insurance regulation and pricing to the States. 15 U.S.C. § 1011. In this context, it is "neither prudent nor appropriate for a federal court to impose the filed-rate doctrine on a state which has not adopted it, nor should a court stretch or bend a state doctrine to more comfortably fit the contours of the federal rule." *Bhasker v. Kemper Cas. Ins. Co.*, 284 F. Supp. 3d 1191, 1233 (D.N.M. 2018) (denying dismissal of insurance claims based on filed-rate doctrine), quoting *Clark v. Prudential Ins. Co. of Am.*, No. CIV. 08-6197, 2011 WL 940729, at *10 (D.N.J. Mar. 15, 2011) (denying motion to strike insurance class claims based on filed-rate doctrine).

doctrine affect federal jurisdiction.[3] Continental has not explained why, in Gunn's case arising under state law, federal law (let alone the narrow niches of federal common law that have survived *Erie Railroad*) could be relevant at all. See *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938); *Williams v. Jader Fuel Co., Inc.*, 944 F.2d 1388, 1400 (7th Cir. 1991) ("the legal and factual sufficiency of an affirmative defense is examined with reference to state law").

Because Continental did not identify the source of governing law, we have little trouble concluding that it did not show properly that it was entitled to judgment based on this free-floating defense.

The more difficult question is what to do about it. "The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals." *Singleton v. Wulff*, 428 U.S. 106, 121 (1976). But the record here offers little guidance. Gunn also did not engage on the choice-of-law issue.

We must say frankly that the parties let the district court down. The parties each asserted their choice-of-law positions, and they clearly signaled that the choice of law could be decisive. But the parties went no farther than those assertions; neither side *supported* its position. The district court did not make

---

[3] There is no suggestion here or reason to think that any version of the filed-rate doctrine affects a federal court's subject-matter jurisdiction. See *Wilson v. EverBank, N.A.*, 77 F. Supp. 3d 1202, 1233 n.6 (S.D. Fla. 2015) (collecting cases holding filed rates go to merits, not jurisdiction); see also *Krukas*, 376 F. Supp. 3d at 14 n.5 (distinguishing "nonjusticiability" rationale for filed-rate doctrine from Article III justiciability).

its own choice of law but cited filed-rate cases from many state and federal courts.

We recognize that an appeal is too late to raise a choice-of-law issue for the first time and we are under no obligation to do so on our own initiative. "We are busy enough without creating issues that are unlikely to affect the outcome of the case (if they were likely to affect the outcome the parties would be likely to contest them)." *Wood v. Mid-Valley Inc.*, 942 F.2d 425, 427 (7th Cir. 1991). In this case, however, both sides raised the choice-of-law issue but then offered the district court (and us) little help.

Choice of law may well be decisive here. The relevant issues are doubtful enough, and the stakes high enough for our state-based systems of decentralized insurance regulation, that they are better addressed by the district court in the first instance, perhaps with help from interested friends of the court who can provide insight into those systems and their relationship to one another. See, e.g., *Harris v. KBR Servs., Inc.*, 724 F.3d 458, 462 (3d Cir. 2013) (remanding for initial choice-of-law determination where necessary to review dismissal for non-justiciability).

B. *Considerations on Remand*

    1. *Illinois Choice-of-Law Rules Control*

We begin with the fundamentals. A federal court exercising its diversity jurisdiction over state-law claims applies the choice-of-law rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941). Here, that state is Illinois, which applies forum law unless an actual conflict with another state's law is shown, *Bridgeview Health Care Ctr. v. State Farm Fire & Cas. Co.*, 10 N.E.3d 902, 905 (Ill. 2014), or

the parties agree that forum law does not apply. See *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 770 N.E.2d 177, 194 (Ill. 2002). Neither Gunn nor Continental seeks application of Illinois law, and the laws of the District of Columbia and Washington appear likely, at a minimum, to give different effect to the acts of the Washington state insurance commissioner. The analysis then turns to which state's law applies. *Bridgeview*, 10 N.E.3d at 905.

In general, Illinois follows the Restatement (Second) of Conflict of Laws (Am. Law Inst. 1971). *Barbara's Sales, Inc. v. Intel Corp.*, 879 N.E.2d 910, 919 (Ill. 2007). For claims on a contract, the Second Restatement usually enforces the parties' contractual choice of law, see § 187, which may extend to tort claims "dependent" on the contract. *Facility Wizard Software, Inc. v. Southeastern Technical Servs, LLC*, 647 F. Supp. 2d 938, 943 (N.D. Ill. 2009). In this case, however, the parties' contract contains no choice-of-law provision.

Absent effective party choice, to govern issues in contract the Second Restatement chooses the "local" law (that is, the substantive law excluding choice-of-law rules) of the state which, "with respect to that issue, has the most significant relationship to the transaction and the parties." § 188(1). To govern issues in tort, the Second Restatement similarly chooses the law of the state which, "with respect to that issue, has the most significant relationship to the occurrence and the parties." § 145(1). These general standards offer little direct guidance in resolving particular cases. See *Barbara's Sales*, 879 N.E.2d at 920. But the Second Restatement also supplies "a secondary statement in black letter setting forth the choice of law rules in a given situation." *Id.* (quotation marks omitted). These "specific presumptive rules" provide more

concrete points of departure. *Townsend v. Sears, Roebuck & Co.*, 879 N.E.2d 893, 902 (Ill. 2007).

For claims regarding a group life insurance contract, the Second Restatement's presumptive rule is that "rights against the insurer are usually governed by the law which governs the master policy." § 192 cmt. h. That is usually the law of the employer's principal place of business, where the master policy was delivered. *Id.* The Illinois Supreme Court has cited this rule with approval in the context of group health insurance. *Hofeld v. Nationwide Life Ins. Co.*, 322 N.E.2d 454, 458 (Ill. 1975). The Couch treatise is in accord as to group insurance generally, 1A *Couch on Insurance* § 8:7, and we have reached the same conclusion as to group accident insurance under Indiana's version of the "most significant relationship" test. *Horn v. Transcon Lines, Inc.*, 7 F.3d 1305, 1307–08 (7th Cir. 1993). Applied to this case, comment h to section 192 of the Second Restatement seems to suggest that Illinois would choose District of Columbia law to govern Gunn's claim for breach of contract.

As for Gunn's tort claims (unfair and deceptive consumer practices, fraud, and fraudulent concealment), the Second Restatement's presumptive rule for torts of deception provides that if the place of defendant's deception and the place of plaintiff's reliance on it were the same, the law of that place applies. § 148(1). If deception and reliance took place in different states, a list of relevant contacts guides the court's determination of what jurisdiction has "the most significant relationship" to the case. § 148(2). Illinois has applied section 148 to consumer fraud claims. *Barbara's Sales*, 879 N.E.2d at 922. Applied to this case, section 148 suggests Illinois may choose either District of Columbia or Washington law to

govern Gunn's tort claims, depending on whether it would legally characterize Continental's alleged misrepresentations as having been made to Gunn in Washington or to his employer in the District of Columbia.[4]

### 2. *The Filed-Rate Doctrine in the District of Columbia*

"In the District of Columbia, the filed rate doctrine is statutorily mandated." *District of Columbia v. D.C. Pub. Serv. Comm'n*, 905 A.2d 249, 256 (D.C. 2006), citing D.C. Code § 34-603. The statutory scheme within which the mandate is embedded provides that every public utility in the District must file proposed rate changes with the D.C. Public Service Commission for the Commission's approval. § 34-901(c)–(d). The statutory filed-rate rule provides that rates approved by the Commission "shall be prima facie reasonable until finally found otherwise in an action brought for that purpose." § 34-603; see also § 34-1129 ("It shall be unlawful for any public utility to … receive a greater or less compensation for any service performed by it within the District of Columbia … than

---

[4] We note one wrinkle in Illinois conflicts law that may or may not bear on this case. Illinois recognizes the doctrine of *dépeçage*, or "cutting into pieces" a single claim and subjecting different issues to different jurisdictions' laws. *Spinozzi v. ITT Sheraton Corp.*, 174 F.3d 842, 848 (7th Cir. 1999). Even if Illinois would choose District of Columbia law to govern one or more of Gunn's claims, perhaps Illinois might choose Washington law to govern Continental's defenses if it determined that Washington had the most significant relationship to the case with respect to a specific issue, such as the filed-rate defense. See *Doctor's Data, Inc. v. Barrett*, 170 F. Supp. 3d 1087, 1107 (N.D. Ill. 2016) (recognizing possibility of splitting claims from defenses under principle of *dépeçage*); see generally Restatement (Second) § 6 (factors relevant to "most significant relationship" analysis).

is specified in such printed schedules … as may at the time be in force.").

The problem for Continental's defense, however, is that this statutory language says nothing about insurers, which are not included in the definition of "public utilities." See § 34-214. Nor does the statute address the District's insurance regulator or insurance premiums. We have found no District of Columbia case or statute applying filed-rate principles in the insurance context. We also have found no District of Columbia case recognizing a filed-rate defense to a suit for breach of a promise as to how premiums would be computed, still less to a suit for fraud. Dicta suggest the District of Columbia may recognize a common law filed-rate doctrine not anchored in a specific statute, see *Watergate East, Inc. v. D.C. Pub. Serv. Comm'n*, 662 A.2d 881, 889 (D.C. 1995) (statute "amounts to a codification of the filed rate doctrine"), but if such a doctrine exists, its contours are yet to be revealed. After all, a legislative decision to adopt the doctrine in one context (public utilities) could be understood as a legislative choice not to adopt it in others (like insurance). And at any rate, the District would still have to balance the policies underlying filed-rate rules against its own consumer protection policies. See, e.g., *McCarthy Finance, Inc. v. Premera*, 347 P.3d 872, 875 (Wash. 2015) ("But while a court must be cautious not to substitute its judgment on proper rate setting for that of the relevant agency, the legislature has directed that the [consumer protection statute] be liberally construed.").

Even if the District of Columbia otherwise recognizes a common law filed-rate doctrine broad enough to bar Gunn's claims, it also is not clear whether such a doctrine would apply to enforce the decision of a different jurisdiction's

regulator. Continental's brief assumes that the public law of Washington must in all events, and in all courts, trump the private law of the District of Columbia. Traditionally, however, courts have been reluctant to enforce the public law of other states. See Restatement (First) of Conflict of Laws § 610 (Am. Law Inst. 1934) ("No action can be maintained on a right created by the law of a foreign state as a method of furthering its own governmental interests."); *id.*, cmt. c ("No action can be maintained by a foreign state to enforce its license … laws"); *Moore v. Mitchell*, 30 F.2d 600, 604 (2d Cir. 1929) (L. Hand, J., concurring) ("To pass upon the provisions for the public order of another state is, or at any rate should be, beyond the powers of a court").

Why would District of Columbia law privilege Washington state's interest in the authority of its insurance commissioner above the District's own interest in affording a remedy to injured plaintiffs whom it would otherwise protect? See *Emory v. Grenough*, 3 U.S. (3 Dall.) 369, 370 n. (1797), translating 2 Ulrich Huber, *Praelectiones Juris Romani et Hodierni*, ch. "De Conflictu Legum" (1689) ("By the courtesy of nations, whatever laws are carried into execution, within the limits of any government, are considered as having the same effect every where, so far as they do not occasion a prejudice to the rights of the other governments, or their citizens."); Joseph Story, *Commentaries on the Conflict of Laws* 33 (1834) ("It is difficult to conceive, upon what ground a claim can be rested, to give to any municipal laws an extra-territorial effect, when those laws are prejudicial to the rights of other nations, or their subjects."), approving Huber, supra. The District of Columbia has an interest in protecting those subject to its laws from unfair and deceptive business practices. See *Shaw v. Marriott Int'l, Inc.*, 605 F.3d 1039, 1045 (D.C. Cir. 2010). Perhaps

more to the point, the District of Columbia has an interest in enforcing contracts negotiated and performed there, *Wright v. Sony Pictures Entm't, Inc.*, 394 F. Supp. 2d 27, 32 (D.D.C. 2005), and the nature of group insurance suggests the master policy in this case fits that description. It is not clear the District of Columbia could or would subordinate those interests to the regulatory interests of the State of Washington.

### 3.  *The Filed-Rate Doctrine in Washington State*

The State of Washington recognizes a "common law filed rate doctrine" not grounded in any statute. *McCarthy Finance, Inc. v. Premera*, 347 P.3d 872, 875 (Wash. 2015). The doctrine has been applied to bar state consumer protection claims challenging health insurance premiums that had been approved by the state insurance commissioner. *Id.* at 876. But claims under the state consumer protection law or for breach of contract that are "merely incidental" to rates approved by the commissioner are not barred. *Harvey v. Centene Mgmt. Co.*, 357 F. Supp. 3d 1073, 1083 (E.D. Wash. 2018) (denying motion to dismiss in part), quoting *McCarthy*, 347 P.3d at 875.

"[W]hile a court must be cautious not to substitute its judgment on proper rate setting for that of the relevant agency, the legislature has directed that the [consumer protection statute] be liberally construed … . In most cases, courts must consider [such] claims even when the requested damages are related to agency-approved rates." *McCarthy*, 347 P.3d at 875. Accordingly, to the extent Washington state law applies, Gunn's claims may or may not be barred depending on whether they are deemed "merely incidental" to or "would necessarily require courts to reevaluate" the commissioner's approval of Continental's rates, as the Washington Supreme Court—and no other court—would apply that

distinction. *Harvey*, 357 F. Supp. 3d at 1083, quoting *McCarthy*, 347 P.3d at 875.

4. *Multistate Regulation of Group Insurance*

In the McCarran–Ferguson Act of 1945, Congress essentially insulated state regulation of "the business of insurance" from the dormant Commerce Clause and from implied federal preemption. 15 U.S.C. §§ 1011–1012; see *American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 427–28 (2003) ("state regulation … will be good against preemption by federal legislation unless that legislation specifically relates to the business of insurance" (quotation marks omitted)); *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 218 n.18 (1979) ("States are free to regulate insurance companies without fear of Commerce Clause attack."). Given the national reach of so many insurance companies and of group insurance policies issued to national employers, regulation of such group policies poses important choice-of-law questions.

Continental's understanding of those challenges leads it to assert that its promise of interstate uniformity in a group insurance policy was illusory. "[L]ike all long-term care insurers," Continental says, it "must seek approval of rate increases on a state-by-state basis." Continental says that the necessity is so obvious that a reasonable customer should have known that any promises of uniform rates among similarly situated insureds should not have been believed. Continental's position is startling, but we have been given no support—as a matter of law, custom, or reason—for its central assumption that the proper regulatory subject is the individual certificate of a customer like Gunn rather than the employer's master policy under which the individual certificates are issued.

A necessary foundation for a filed-rate defense is the regulator's "jurisdiction to determine the reasonableness of rates." *McCarthy*, 347 P.3d at 875. Washington asserts, as it can assert, legislative and regulatory jurisdiction over only in-state activity. See *Midwest Title Loans, Inc. v. Mills*, 593 F.3d 660, 666 (7th Cir. 2010), quoting *Healy v. Beer Inst.*, 491 U.S. 324, 337 (1989); *Dean Foods Co. v. Brancel*, 187 F.3d 609, 614–15 (7th Cir. 1999), quoting *Bonaparte v. Tax Court*, 104 U.S. 592, 594 (1881); Wash. Rev. Code § 48.01.020. As to ratemaking, Washington requires that every company "engaged in the business of making contracts of insurance" file its proposed rates with the insurance commissioner for approval or disapproval. Wash. Rev. Code § 48.01.050; see §§ 48.19.040, 48.19.060. The question then is how to describe the legal geography of a group insurance policy with an employer and master policy in one location and individual insureds all over the nation. More than one state has at least arguable interests in such national policies and the individual certificates issued under them.

As noted above, the key contractual event in group insurance transactions is generally held to be delivery of the master policy, not the individual certificates issued under it. See 1A *Couch on Insurance* § 8:1 ("the addition of new individual members to a master group policy does not create a new contract of insurance."). Apparently on the same understanding, Washington's current statutory regulation of group long-term care insurance applies to "a long-term care insurance policy or contract that is delivered or issued for delivery in this state" and "any certificate issued under a group long-term care insurance policy that has been delivered or issued for delivery in this state." Wash. Rev. Code § 48.83.020. (The long-term care insurance statute in force in 2000, when Gunn first

obtained coverage, did not address group insurance specifi-
cally. See Wash. Rev. Code § 48.84.020; Wash. Admin. Code
§ 284-54-010.) So we might expect the Washington state insur-
ance commissioner to care about master policies delivered in
Washington and about certificates issued, no matter where or
to whom, under master policies delivered in Washington.

That would make good multistate sense. If universalized,
it would mean that every group policy has one and only one
regulator, steering clear of the regulatory Scylla avoided in
the private-law context by the usual choice-of-law rule. See
*Horn v. Transcon Lines, Inc.*, 7 F.3d 1305, 1307 (7th Cir. 1993)
("There is only one policy and one form of certificate evidenc-
ing coverage. We cannot imagine why Liberty Mutual would
prefer a choice-of-law approach under which 50 different
rules govern the same policy of insurance"); Restatement
(Second) § 192 cmt. h ("it is desirable that each individual in-
sured should enjoy the same privileges and protection"); 1A
*Couch on Insurance* § 8:7 ("This rule prevents the same policy
from being interpreted according to the law of potentially 50
states thus creating uniformity in the coverage and protection
of every individual insured under the group policy.").

But Continental proceeded on nearly the opposite as-
sumption in 2015, when it sought the challenged rate in-
creases. Continental wrote the Washington insurance com-
missioner:

> The new premium rates will be applied to all in-
> sureds under group policies that were sitused in
> your state except insureds under the group pol-
> icies sitused in your state that were issued cer-
> tificates in another state that is an extraterrito-
> rial (ET) jurisdiction. These insureds are

> governed by the other ET state's laws and regu-
> lations and will be included in that state for rate
> increase purposes. The new premium rates will
> also be applied to insureds issued in your state
> under groups sitused outside of your state.

As we read this letter, Continental submitted rates to the commissioner for every individual certificate issued in Washington, even if the master policy had not been delivered there, but not for every master policy delivered in Washington, if the certificate was issued in an "extraterritorial jurisdiction" (which appears to describe Washington as well).

The briefs do not explain what is an "extraterritorial jurisdiction," what makes it one, or whether the District of Columbia is one, nor did counsel at oral argument. We assume that interstate regulation of insurance transactions involves a good deal of comity and agreement among regulators of different states, without each regulator always pushing for maximum power. Any state's claim to extraterritorial power merits further inquiry, at least. Continental's letter to the Washington insurance commissioner suggests if nothing else that its basic position is overstated: at least some states, those that are not "extraterritorial jurisdictions," are content to leave ratemaking authority in the hands of the regulator where the master policy was delivered, even if certificates under that policy are issued to insureds within their own borders.

Untying this knot is not possible on the record now before us. But it is essential to even a threshold determination of the validity of any filed-rate defense that would give decisive effect to the decisions of the Washington state insurance commissioner. We must remand this task to the capable district judge, who may find it useful to enlist the help of interested

amici, including the National Association of Insurance Commissioners, associations of insurance companies, and perhaps others who can educate generalist federal courts about the broader implications of choice-of-law rules as applied to group insurance policies.

We acknowledge the questions we have posed are more easily asked than answered. And we have not framed or discussed those questions with any intention to prejudge the correct outcome(s) in this case. The district court may find that a motion under Rule 12(c), a motion for summary judgment on a more complete record, or perhaps a motion for class certification could bring the issues into sharper relief. See *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1015 (7th Cir. 2002). Those are case management issues best left to the district court's discretion. The judgment of the district court is REVERSED and the case is REMANDED for further proceedings consistent with this opinion.